### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

**Shawn Hogya, James Francis, James Aikens and Chris Wilson, Intervenors,**

v.

### UNITED PARCEL SERVICES, INC., Defendant.

**No. C 97–00961 WHA.**

United States District Court, N.D. California.

Dec. 12, 2000.

Jonathan T. Peck, David T. Kelley, William R. Tamayo, San Francisco, C. Larry Watson, Charles E. Guerrier, Cleveland, OH, for E.E.O.C.

John J. Mavredakis, Law Office of John J. Mavredakis, Santa Rosa, CA, for James Aikens, James Francis, Chris Wilson, Shawn Hogya.

Patricia S. Radez, Steven S. Kimball, Pamela L. Hemminger, Gibson Dunn & Crutcher LLP, San Francisco, CA, for United Parcel Service.

**FINDINGS OF FACT AND CONCLU-
SIONS OF LAW AFTER BENCH
TRIAL AND INJUNCTION WITH
TEMPORARY STAY PENDING
APPEAL**

ALSUP, District Judge.

## INTRODUCTION

In this case under the Americans with Disabilities Act, 42 U.S.C. 12101, *et seq.*, the issue is whether applicants with excellent vision in one eye but little or no vision in the other may be categorically excluded by United Parcel Service, Inc., from any and all driver positions regardless of their actual safety records and driving abilities. The issue is not whether an individual's vision may be a factor in assessing his or her qualification for such a job. Without question, it surely can and should be. Nor is the issue whether public safety can be compromised by the ADA. Sufficient vision to drive safely is a manifest and essential job function for all positions at stake. This order makes clear that UPS need not employ any disabled driver posing a greater safety risk than the unimpaired drivers it otherwise employs. Rather, the essence of this case concerns whether the particular per se rule of categorical exclusion used by UPS is lawful under the ADA. On the trial record herein, this order holds that UPS has not proven that its omnibus rule is lawful. Therefore, until UPS adopts a standard that satisfies the ADA, it must make individualized employment decisions that allow otherwise qualified monocular applicants to try to demonstrate that they can perform the essential job function of driving safely.

### Procedural History

In 1995 UPS adopted a nationwide "vision protocol." This set eyesight standards for its drivers of smaller UPS vehicles, those not regulated by federal authority. In practice, anyone failing the protocol has been categorically barred from any and all driving positions with no inquiry into his or her actual abilities or safety record. To challenge the per se rule, this action was filed by the EEOC against UPS in March 1997, alleging discrimination against monocular driver applicants and seeking nationwide relief on their behalf. Certain individual applicants, including James Francis and Shawn Hogya, intervened as party plaintiffs. After considerable discovery, massive cross-motions for summary judgment were made and denied. The Court directed that the trial would comprehend four pilot claimants selected by plaintiffs and that all other claimants for whom a summary judgment opposition had been filed would temporarily remain in abeyance. The pilot claims were intended to illuminate the UPS vision protocol and driving positions at issue. A bench trial followed. During trial, the Court conducted a view of various UPS vans and package cars, sat in drivers' seats, and inspected package compartments. There were several post-trial submissions and a two-day oral argument.

### Subject–Matter Jurisdiction

The EEOC may sue a private employer in district court to enforce Title VII and the ADA based on an employee's charge of discrimination if the employer fails to submit to a conciliation agreement acceptable to the EEOC. 42 U.S.C.2000e–5(f)(1). Without the necessity of class-action procedures, the EEOC may seek relief for all aggrieved employees. Only practices made part of a reasonable-cause determination; however, may be litigated. *EEOC v. Hearst Corp.*, 553 F.2d 579, 580 (9th Cir.1976). In light of the reasonable-cause determinations as to Yvonne Harbison and James Francis (TX 1073, 1078), the Court has subject-matter jurisdiction to hear and determine all claims of applicants similarly situated. *EEOC v. Dinuba*

*Medical Clinic,* 222 F.3d 580, 589 (9th Cir.2000). Even though Ms. Harbison settled her claim after the cause determination, her claim still provides jurisdiction for the EEOC to seek injunctive and declaratory relief on behalf of others similarly situated. *EEOC v. Goodyear Aerospace Corp.,* 813 F.2d 1539, 1542 (9th Cir.1987); *EEOC v. Frank's Nursery & Crafts, Inc.,* 177 F.3d 448, 456 (6th Cir.1999). Whether the Court has jurisdiction over the claims of UPS mechanics will be considered below.

## FINDINGS OF FACT

At the close of evidence, the parties submitted over 2400 proposed findings. As a concession to comprehensibility, the Court has tried to reduce the bulk, to focus on the essentials, and to distill the findings while still covering the case sufficiently so that both sides may fairly present their legal arguments on appeal. That said, a number of proposed points have been omitted as too remote. This order will cite the record as the exception and not the rule.

### UPS Business and Organization

1. United Parcel Service is the world's largest private carrier of packages with 340,000 employees worldwide. Deliveries and pickups are made via "package cars," *i.e.,* the familiar brown UPS trucks. UPS employs about 70,000 package-car drivers in the United States. They normally operate solo, doing all the driving, pickup and delivery alone.

2. The corporate headquarters of UPS is located in Atlanta. There are twelve geographical regions within UPS. The twelve regions contain 62 geographical districts. Corporate UPS supports the regions. The regions support the districts. The latter are the operating level. Each district is a semi-autonomous operation employing on average 5000 employees.

3. Within a district, there are four divisions: a package division, hub operations, feeder operations, and staff. The package division is organized around "centers," out of which the local package cars operate. Typically, a center will have from forty to sixty drivers. Each district has many centers and almost all districts have at least one hub. A hub is like a wheel with spokes extending to centers. The hub receives packages from centers (and from other hubs). Feeder operations move packages between centers and hubs (and between hubs) via multiple-axle tractor trailers. At centers and hubs, packages are received, sorted by destination, and dispatched to the next logical node in the network.

4. The Northwest Region includes Washington, Oregon and California down to Bakersfield. The East Bay District is within the Northwest Region. The East Bay District extends from Napa in the north to Union City in the south (excluding Fremont). It extends into the Central Valley and includes San Ramon, Walnut Creek, Concord, Cordelia, Modesto and down to Bakersfield.

### The Daily Package Cycle

5. The first step in the daily package cycle occurs when a customer decides to send a shipment by UPS. The package is picked up by the UPS operator assigned to the route. Pickups usually occur in the afternoon. The driver transports all pickups back to the center at the end of the work day.

6. All packages are then unloaded onto a conveyor belt and separated by zip-code destinations. So sorted, packages are next loaded onto various tractor-trailer trucks to be delivered to appropriate hubs. Sorters are generally part-time "inside" employees.

7. At the delivery end of the cycle, the process is reversed. Packages accumulate

at the appropriate centers where they flow onto conveyors and are sorted by local route and are then loaded on the vehicle for that route. This "pre-load operation" normally begins about 3:00 a.m. and runs for three to four hours. Like sorters, pre-load employees, or preloaders, are also part-time personnel. Once loaded, the package cars exit and run their delivery routes, starting at about 8:30 a.m. By the afternoon, the delivery process melds into the pickup process and the cycle starts all over again. The work day for drivers is from 8:00 a.m. to 6:00 p.m.

### Structure of UPS Labor Force and Progression to Package–Car Driver

8. Most entry-level UPS jobs are part-time. Part-time employees eventually earn enough seniority to bid for full-time positions. A typical pattern is that a part-time sorter or preloader, after accumulating enough seniority, will bid to become a full-time driver as openings occur and will drive until retirement. All relevant jobs will now be described.

### Part–Time Jobs

#### Preloaders and Local Sorters

9. Preloaders are part-time employees who load package cars before the drivers report to work. This is the entry level for most UPS employees. Preload operations begin at around 3:00 a.m. and generally last three to four hours. The job consists of picking up packages from a moving belt and loading them onto trucks. Similarly, "local sort" employees work in the afternoons unloading incoming packages from the package cars, and then sorting and reloading them onto tractor trailers. Local sort employees also work on a part-time basis. The local sort shift runs from approximately 5:00 p.m. to 9:00 p.m.

#### Utility (or Cover) Drivers

10. Utility drivers fill in for absent full-time package-car drivers as needed. They deliver packages when there are not enough package-car drivers to cover all the delivery routes that day. Part-time employees who work as utility or cover drivers do so in addition to their regular job duties. They often work the early morning preload shift, for example. They do not drive on a daily basis. When they do, however, they work the same hours as the package-car drivers. Under the seniority system, UPS may not call on utility or cover drivers if full-time drivers are available.

#### Part–Time Air Drivers

11. Air packages are airmail. They are delivered by part-time employees as well as full-time employees known as air drivers. Some part-time air-delivery driver positions are bid jobs that enable the drivers to perform "scheduled" air driving five days a week. These "air drivers" have a standing start time and serve a designated area. Other air work is "exception" or "call-in" work. These employees have another regular part-time job and perform air driving only in exceptional cases, such as when an aircraft arrives late or when a facility experiences a problem that delays a dispatch.

### Full–Time Jobs

#### Package–Car Drivers

12. The primary job at stake in this litigation is the package-car driver. UPS employs approximately 70,000 of them in the United States. There are two types of full-time package-car drivers. Some are called "bid" drivers because they have sufficient seniority to bid on and keep a single route. Each operates the same route and vehicle every work day. Bid drivers are the most senior.

13. At any center, however, there are more full-time drivers than available bid routes. Extra drivers are needed to cover unplanned spikes in volume and to accom-

modate drivers who are sick or on vacation. These extra full-time drivers are called "unassigned." Although they have enough seniority to be full-time drivers, they do not yet have enough seniority to win a bid route. Unassigned drivers may be required to cover up to five different routes in a single week. Accordingly, unassigned drivers may be assigned vehicles of all sizes, including those heavier ones subject to the strict vision requirements of the United States Department of Transportation ("DOT"), which are explained below.

### Full–Time Air Drivers

14. In addition to part-time air drivers, there are some full-time air drivers who deliver and pick up packages for overnight delivery. The volume of air packages has increased over the last five years, but the number of air drivers has decreased. It is more economical to deliver air packages through regular package drivers rather than through air drivers. Thus, more and more air packages are being delivered by regular full-time package drivers rather than by air drivers. For this reason, there are few full-time air-driving jobs.

### Mechanics

15. Mechanics are full-time employees. Mechanics rebuild and repair UPS vehicles and their components. This includes changing oil, changing tires, performing body repair, and rebuilding brakes, clutches and transmissions. Mechanics perform some driving work for UPS in the context of making road calls with vehicles and taking vehicles on road tests. This lawsuit also alleges discrimination with respect to UPS driving restrictions on monocular mechanics.

### Feeder Jobs

16. Feeder drivers are full-time employees who move packages between distribution centers and hubs in multiple-axle tractor trailers. These are high seniority jobs. UPS employs approximately 15,000 feeder drivers. These positions are not at issue in this lawsuit because all the heavy trucks they drive are subject to the DOT vision standards.

### The UPS Fleet

17. This lawsuit concerns only that fraction of the overall UPS fleet exempted from the DOT safety regulations. Since 1995 (and arguably earlier), the DOT safety regulations have applied only to vehicles with a Gross Vehicle Weight Rating ("GVWR") of 10,001 pounds or more. GVWR is the maximum loaded weight of the vehicle as set by the manufacturer. Nationwide, UPS currently has a fleet of 67,178 package cars of all sizes. Of that fleet, 5,511 have a GVWR of 10,001 pounds or less.

18. UPS package cars are classified by the cubic feet in their cargo hold. For example, a P500 has 500 cubic feet of cargo space. A P500 is sometimes called a P50, for short. Non–DOT package cars include P20's (Dodge Caravan or Ford Aerostar, both 200 cubic feet), P30's (Ford Econoline or Econovan, both 300 cubic feet), P31 (Econoline with an extended roof, 310 cubic feet), P32's (UPS brown trucks with 320 cubic feet of cargo space), P35's and P40's (same with 350 and 400 cubic feet), and P50's (UPS delivery trucks with 500 cubic feet of cargo space).

19. P500 package cars are made by two different manufacturers. One brand has a GVWR of slightly over 10,001 pounds and the other is slightly under. Those under typically have a GVWR of 9300 to 9600 pounds. Those over have a GVWR of 11,300 pounds. All have the same dimensions, except the heavier vehicles are eight to ten inches higher. The lighter versions are generally 20 to 25 years old. The useful life of a UPS package car depends on the area of the country, but where conditions are optimal, it is between 20 to

25 years. Currently, 175 non-DOT P500's are scheduled for disposal in 2001.

20. P40's have a GVWR of 8,000 pounds. P32's have a GVWR of 8,600 pounds. P31's have a GVWR of 8,500 pounds. P30's have a GVWR of 7,900 pounds. P20's have a GVWR of 5,300 pounds. (Curiously, the P40 is lighter than some of the smaller vehicles.)

21. The vans, *i.e.*, the P20's and P30's, have a useful life of three to five years, slightly longer in optimal conditions. P20's and P30's are ordered without windows on the rear sides and back, if available. They are structurally stronger without windows. Shifting packages can break windows. Windows may also encourage theft. Where these vehicles are ordered with windows, they are often modified by inserting a plywood liner in the cargo areas and painting the windows. P20's, P30's and P31's are used for air-exception or part-time air-delivery work.

22. The trend at UPS, based on package volume, favors larger package cars. With few exceptions, routes are not delivered in package cars smaller than a P32. P32's and P500's are used on routes with fewer packages and more driving and stops, *i.e.*, rural routes and residential routes. Of the non-DOT package cars, most are P32's and P500's with a GVWR under 10,001 pounds. UPS has 2958 and 1263 units of each, respectively. Eight percent of the UPS fleet weighs less than 10,001 pounds.

23. In the East Bay District are approximately 830 routes, of which 105 are P500 routes. Each of these routes could be delivered in trucks weighing 10,001 pounds or less. In Northern California, there are currently 79 P500's with a GVWR under 10,001 pounds.

24. Package cars may be reassigned from one center to another depending on need. Nothing prohibits moving package cars from district to district.

**UPS Route Definition**

25. All UPS routes are organized around centers. UPS uses a loop concept to design routes. A concentric set of imaginary geographic loops emanate from the center, each loop comprising a route. UPS designs routes to minimize miles and optimize stops per car, consistent with customer service. As stated, for example, in the East Bay District there are 830 routes.

26. The UPS Industrial Engineering Department ("IE") helps to optimize efficiency through work measurement and operations planning. For the package-delivery operations, the IE department decomposes the work day into tasks and time studies are conducted. An observer spends an entire day with a package-car driver, timing each task. Once the tasks are measured, average times are developed. The averages developed through the time studies are used to develop routes which will fit within a UPS "planned day."

27. UPS designs its routes to provide a minimum of eight hours of work for the delivery driver and a maximum of 9.5 hours. These hours are set by the terms of the collective bargaining agreement. It requires that full-time package-car drivers be paid for a minimum of eight hours for any day they work without working more than 9.5 hours on a regular basis. UPS aims for 8.7 hours.

28. Once the route is defined, UPS estimates the normal volume and size of the packages on the route. It then assigns the smallest package car that can handle the volume, leaving some extra room for operator movement in and out of the package compartment. New routes are provoked by an increase in package volume. The principal criterion for adding a new route is whether it is justified based on the average stops per car.

29. Because the smallest vehicle which will fit a route is assigned to that route, fitting a route into a yet smaller vehicle would impose additional costs. If a smaller package car is assigned to a route, all of the packages for delivery and pickup will not necessarily fit into that package car.

30. When routes are added or subtracted, other routes are affected as work is added to or taken away from them. UPS, however, does not need the union's approval for changing a route (up to fifty percent) or to add a new route. UPS can change the equipment assigned to a route without the union's consent.

## The Collective Bargaining Agreement and the Role of Seniority

31. The terms and conditions of employment of UPS drivers and other UPS employees are established by collective bargaining agreements with the Teamsters United Parcel Service National Negotiating Committee, and with local unions affiliated with the International Brotherhood of Teamsters (TX 2). The National Master United Parcel Service Agreement ("National Master Agreement") applies to all UPS employees represented by the Teamsters in the United States. Full-time employees in the UPS districts of Northern California, East Bay and Sacramento Valley who are represented by the Teamsters are governed by the "Northern California Supplement" in addition to the National Master Agreement. Part-time UPS employees in Northern California who are represented by the Teamsters are covered by the "Northern California Sort Rider" in addition to the National Master Agreement. UPS mechanics in Northern California are represented by a different union than the Teamsters and are covered by wholly different collective bargaining agreements.

### Seniority Generally

32. UPS's collective bargaining agreements with the Teamsters have contained seniority provisions since their inception. One section of the Northern California Supplement is dedicated solely to emphasizing the importance of seniority: "The company recognizes that the principles of seniority will be given prime consideration in the everyday operation of the business" (TX 1). Seniority provisions, bidding rights and grievance procedures are generally set forth in supplemental collective bargaining agreements and riders rather than in the National Master Agreement.

33. There are separate seniority lists for part-time and full-time employees. Full-time drivers retain no standing on the part-time seniority list and vice versa. The contract does not allow employees to earn seniority on both full-time and part-time seniority lists. Under some circumstances, UPS employees may transfer between buildings. When they do so, they are put at the bottom of the relevant seniority list for the new building. They keep their company seniority only for purposes of benefits.

### Selection of Package–Car Drivers and Assignment of Bid Routes

34. The threshold selection criterion for package-car drivers is seniority. Part-time employees who successfully bid into the package classification remain on the part-time seniority list until completing the thirty-day probationary period. Then they are removed from the part-time list and added to the bottom of the full-time list. "Bid" package routes are also awarded by seniority. Only full-time driving seniority counts. It can take five to six years of full-time driving to bid successfully for a "bid" route, although less time is common too. Delivery routes become available for bid when a package-car driver vacates an

existing route or when UPS creates a new one.

35. In Northern California, when a route is bid as a result of a permanent vacancy or new position, the route is posted for bid by any driver in the building. When a route is bid, the company must post the bid for five days and must provide a geographic description of the route, including the number of stops on the route and other general characteristics of the route. This description enables employees to decide whether to bid. The most desirable routes are usually those that cover more miles and involve fewer packages and fewer stops. Drivers on these routes do not have to get in and out of the vehicle as much or carry as much. Typically, small vehicles such as P500's (as opposed to P800's) are assigned to these high-mileage routes. The smaller vehicles carry fewer packages and are more fuel efficient.

36. In the Richmond building (in the Northern California district), the least-senior driver to have successfully bid on a P500 route had seven years of driving seniority. P500 drivers in the Richmond building have, on average, 13.5 years of full-time driving seniority. In the Petaluma building, there are two routes delivered in P32's. One is held by a driver with full-time seniority beginning in 1981 and the other by a driver with seniority beginning in 1985.

### Bidding by "Unassigned" Package–Car Drivers

37. Package-car operators may be "unassigned" for years before gaining enough seniority to hold a "bid" route. The "unassigned" fill in for absent "bid" package-car drivers. Under the Northern California Supplement, bid routes that are temporarily available for more than five days must be filled for the duration of the temporary vacancy by seniority. For shorter periods, the company usually selects an unassigned driver on the basis of seniority. UPS may choose a driver who has knowledge of the route over a more senior driver without such knowledge, but the most senior unassigned drivers tend to be familiar with more routes.

38. It is easier to bid into the package classification from a full-time air position than from a part-time position because full-time driving jobs are open to full-time employees first. For bid-package routes, however, it is one's seniority as a package driver rather than one's seniority as a full-time employee that determines bid rights.

### Seniority and Part–Time Employees

39. Part-time jobs are also awarded to part-time employees on the basis of seniority, usually through a bidding process.

### Air Drivers

40. UPS posts a notice when it needs new air-exception drivers. Qualified employees who indicate interest are given air-exception work in seniority order. Air-driving positions for scheduled air runs also are awarded on the basis of seniority. Part-time air drivers accrue seniority on the part-time seniority list. A sorter who begins performing air-driving work —— whether on a scheduled bid run or on an "exception" basis —— remains on the part-time seniority list with the same part-time seniority date.

### Utility (or Cover) Drivers

41. Interested part-time employees are called for utility-driving work in order of their part-time seniority. Utility drivers are part-time employees. They earn part-time seniority. These part-timers gain valuable experience regarding route knowledge.

### Selection and Training Procedure for Package–Car Drivers

42. Although the vision standards are at the heart of this case and will be described momentarily, it is important to appreciate the overall selection process for

package-car drivers. The threshold criterion is seniority, as stated. When the openings are posted, part-time employees can apply via letters of intent or by signing bid sheets. Then they must complete a written application, provide a motor-vehicle certification, answer a DOT safety questionnaire, and submit a DMV printout. Employees are disqualified immediately if their driver records show too many citations. In Northern California, a driver applicant would be disqualified if the DMV record showed traffic citations with a combined value of three "points," as assessed by the California DMV, within the last three years.

43. The employee must then complete a road test within an established error range. It is conducted on a ten-mile course on public streets. It is intended as a gate-keeping exercise, to determine if the individual has the basic skills to go on. Examinees typically have never driven a package car before. Few fail. The test is not intended to be a final assessment of the care and safety of the applicant.

44. Applicants must then take a physical exam. For vehicles over 10,001 pounds GVWR, as noted, DOT imposes certain vision standards for both eyes. UPS normally requires all applicants to pass the test on the theory that entry-level package-car drivers will be asked to drive many different routes and thus heavy as well as lighter trucks (*i.e.*, DOT and non-DOT vehicles). For the vision-impaired, however, UPS will substitute its vision protocol (requiring good vision in only one eye but some vision in the other) as an accommodation.

45. Those who pass advance to classroom training. UPS emphasizes defensive-driving training. UPS bases its training on what it calls its Space and Visibility methods, which, in turn, include the so-called "Five Seeing Habits," the "Ten Point Commentary" and the "Rules of

Backing and Parking." The Space and Visibility methods focus on use of visual skills to detect hazards and avoid accidents. They include the Five Seeing Habits which are drilled into the recruits. They are (TX 17):

(a) Aim high in steering. The purpose of this rule is to find a safe path well ahead, to center the vehicle in the travel lane and to provide a safe path on turns.

(b) Get the big picture. The purpose of this rule is to be able to view well ahead of the vehicle to detect moving objects, including pedestrians, children playing, other vehicles and merging traffic and to detect fixed objects such as parked vehicles, traffic signals and signs. This also allows drivers to maintain the proper following distance. Inadequate following distance causes reduced visibility and reduced time to react.

(c) Keep your eyes moving. The purpose of this rule is to avoid accidents by staying constantly ahead of the "visibility job." Drivers are taught to scan, not stare, and to shift their glance from object to object every two seconds. They are taught that when approaching an intersection, they should look left, right and left again.

(d) Leave yourself an out. The purpose of this rule is to ensure that drivers can constantly gather traffic information, make plans and take action when necessary.

(e) Make sure they see you. This rule teaches drivers to use their horn, lights and signals to communicate with others in traffic.

46. The Ten Point Commentary includes (TX 17):

(a) Leave one car length space when stopped in traffic.

(b) Look left, right, left at intersections and then check your mirrors.

(c) Count one, two, three at start up to create a space cushion around the vehicle.

(d) Allow four to six seconds following time to allow the driver to get the big picture.

(e) Check your mirrors every five to eight seconds to get the big picture, keep your eyes moving and leave yourself an out. Drivers are taught a process called "triangular viewing" where the driver checks the mirror on one side, moves his or her vision to the middle of the "big picture," and then moves his or her eyes to the other mirror.

(f) Scan the steering wheels of cars along the curb to see if the vehicles are occupied and to be prepared in case the driver decides to pull away from the curb.

(g) Check for stale green traffic lights to determine whether you will have to stop, and look at the cross traffic.

(h) Maintain eight to twelve seconds of eye lead time to give the driver the big picture.

(i) In pulling out from the curb, check your mirror and glance over your left shoulder to check for anything in your blind spot.

(j) Make eye-to-eye contact to ensure that the other driver or pedestrian sees you. "When you establish eye contact, you can expect the other driver to act in a reasonably predictable manner and avoid [a] dangerous situation."

47. After completing the Space and Visibility training, the applicant spends a full day learning to apply the training in a UPS vehicle under supervision.

48. Then follows a thirty-day qualification period. Applicants drive a training route for thirty days. There is direct supervision for the first three to six days, a series of follow-up rides, and a final ride with the center manager. Space and Visibility training is revisited three to four times during the thirty days. In addition to defensive-driving techniques, UPS trains drivers on its products and delivery procedures. It is not unusual for trainees to be disqualified during the thirty-day probationary period. Unsafe candidates are rejected. At the completion of the thirty-day probationary period, if the trainees have demonstrated that they can deliver the route in a timely and safe manner without service failures, they graduate.

49. Air drivers are provided the same safety training, but the remaining topics are provided in a condensed form.

### Safety and UPS Accident History

50. UPS puts 75,000 package-car drivers on public roads every work day. Despite its emphasis on safety and driving defensively, UPS trucks have been involved in many thousands of accidents.

51. In recent years, there have been between 20,000 and 27,000 accidents involving package cars annually. The most frequent accidents involve backing. The most serious typically involve intersections, pedestrians, head-on collisions, and rear-ending someone. In 1999, UPS drivers were involved in 52 fatal accidents, of which 36 involved package cars. All of these involved binocular drivers.

### Federal and State Vision Requirements

52. Since 1937, a succession of federal agencies have promulgated the Federal Motor Carrier Safety Regulations. Prior to 1988, those regulations (then as now promulgated by DOT) required drivers of motor vehicles in interstate or foreign commerce to pass a physical test and to obtain a certificate of medical examination. This included a vision requirement of $^{20}\!/\!_{40}$ vision (Snellen) in *each* eye,[1] and peripher-

---

1. The parties stipulate that Snellen measure- ments were properly defined in *Albertson's,*

al vision of 70 degrees in the horizontal meridian for *each* eye, among other things.

53. It is common ground herein that the DOT standards trump the ADA as to any vehicles covered by the DOT regulations. The parties are in further agreement that up to at least 1988, *all* UPS vehicles were subject to this requirement. They agree that from at least July 1995 forward, the DOT requirements had no application to lighter-weight vehicles and, therefore, the ADA applied to employment practices concerning those vehicles. But the parties are in disagreement as to whether the DOT regulations applied between July 1992, the effective date of the ADA, and July 1995.

54. In May 1988, DOT published its intention to suspend its physical requirements for vehicles weighing less than 10,-001 pounds. 53 Fed.Reg. 18044 (May 19, 1988). The announcement noted that the states should thenceforth decide on any vision requirements for lighter-weight vehicles. The published rules, however, failed to carry out this intention, evidently through a drafting error, and it was not until July 1995 that a formal "correction" was made to delete vehicles weighing less than 10,001 pounds from the vision regulation. 60 Fed.Reg. 38739 (1995). Nonetheless, UPS knew at all material times prior to 1995 that DOT was no longer enforcing the vision requirements for lighter-weight trucks. This knowledge, together with the 1992 effective date of the ADA, was one of the motivating forces behind UPS's adoption of its vision protocol.

55. Forty-two states grant unrestricted passenger-car licenses to monocular drivers, while eight states and the District of Columbia have restrictions varying from daylight driving only, to restrictions on time of day and geographic areas, speed, and other unspecified restrictions. Certain of the 42 states do have visual field requirements. Some impose requirements for mirrors. Monocular drivers may be required to have periodic check-ups with an eye-care specialist, and in several states, eye-care specialists are charged with the duty of making recommendations regarding restrictions. In addition, restrictions may apply if the vision in the better eye is worse than 20/40. These privileges and restrictions were in place at all relevant times.

### The UPS Vision Protocol

56. When UPS moved its corporate headquarters to Atlanta, it established a relationship with Emory University as a source of consultants on medical issues. Dr. Howard Frumkin was in 1992 a physician at Emory University in the School of Public Health. His colleague, Dr. Ned Witkin, was then and remains a doctor of optometry and is an assistant professor of ophthalmology. He is also the Chief of Optometry at Grady Memorial Hospital. He is an expert in vision but not in driving. Dr. Ed Galaid was in 1994 a physician in occupational medicine at Emory.

57. In 1992, DOT was considering an experimental waiver program whereby monocular drivers could operate large and small vehicles. UPS wished to oppose the proposal. On May 22, 1992, Susan Pelchat, the chief nurse for UPS, sent a letter to Dr. Frumkin, asking a series of questions. The letter stated: "In response to the proposed rulemaking for vision waivers

*Inc. v. Kirkingburg,* 527 U.S. 555, 559, 119 S.Ct. 2162, 144 L.Ed.2d 518 n.2 (1999):

> Herman Snellen was a Dutch ophthalmologist who, in 1862, devised the familiar letter chart still used to measure visual acuity. The first figure in the Snellen score refers to distance between the viewer and the visual target, typically twenty feet. The second corresponds to the distance at which a person with normal acuity could distinguish letters of the size that the viewer can distinguish at twenty feet.

by DOT, I'm requesting your assistance in formulating a corporate medical recommendation" (TX 32). Dr. Frumkin forwarded the request to Dr. Witkin.

58. Nurse Pelchat received a response from Dr. Witkin (TX 35). His letter answered "the questions you had regarding vision requirements for Commercial Motor Vehicle Operators (CMV)." With respect to minimum visual acuity in the "affected eye," Dr. Witkin stated: "Keeping in mind the 20/40 visual acuity requirement in the better eye, the range of visual acuity in the affected eye could be 20/50 to 20/200. Twenty-two hundred vision is 'gross object perception' and even in the case of a CMV operator getting something in the better eye, he/she would still be able to get to a safe stop until the vision cleared in the better eye" (TX 35).

59. With respect to depth perception, he replied:

There are several different types of "depth perception" (TX 35):

A. Stereopsis or Stereoscopic Vision — requires two eyes of equal best corrected visual acuity pointed at the object of regard measured in seconds of arc. Individuals with unequal best corrected visual acuity and/or individuals with strabismus (eye turn) have reduced or non-existent stereopsis. Stereoscopic vision is not useful beyond one hundred yards.

B. Monocular Cues To Depth — these do not require two eyes pointing simultaneously at the object of regard. Even monocular patients have monocular cues to depth. Examples of monocular cues to depth are relative size, interposition, distance and color. I feel that CMV operators can operate their vehicles safely even without stereoscopic visual acuity. I recommend that those CMV operators with less than one hundred seconds of stereopsis should have additional side mirrors including a true im-

age size mirror and a field expanding (convex) mirror . . . .

60. With respect to whether there should be a visual-acuity requirement for both eyes as opposed to one eye, he replied (TX 35):

I think I have addressed this question in answering the very first question [re visual acuity in the "affected" eye]. I recommend that the CMV operator have 20/40 best corrected visual acuity in the "better" eye and at least 20/200 in the "affected" eye. I do not believe that equal visual acuity of 20/40 or better is absolutely essential for the operation of a commercial motor vehicle.

61. With respect to visual field, he stated (TX 35):

The definition of the visual field is: "The area or extent of physical space visible to an eye in a given position. Its average extent is approximately 65 degrees upward, 75 degrees downward, 60 degrees inward, and 95 degrees outward when the eye is in the straightforward position" (*Dictionary of Visual Science*, Schapero Cline and Hofstetter, 1965). The combined visual field is the view using both eyes together. Studies have shown that safe driving requires a combined visual field of at least one hundred and forty degrees.

62. Dr. Witkin also had performed a Medline literature search. A Medline search reveals peer-reviewed journals. The search produced one article relevant to the relationship between vision and safe driving: Fonda, "Legal Blindness Can Be Compatible With Safe Driving," *Ophthalmology*, Oct. 1989, Vol. 96, No. 10 (1989). It defined legal blindness to mean the best corrected vision in the better eye with conventional spectacles or contact lenses is 20/200 or worse. The article stated that individuals legally blind could nonetheless

drive safely. Dr. Witkin, however, disagreed with that assessment.

63. Dr. Witkin, however, did not do any independent library research in preparing his answers to these questions. He did not drive any of the vehicles operated by UPS, did not interview any of the drivers, and did not interview any commercial vehicle operators. His letter advised UPS that there was a lack of sound research studies, but based on his clinical experience, some limited visual impairments would still permit safe driving by a trained commercial motor-vehicle operator. Other than his anecdotal experience, Dr. Witkin did not have any studies to support his view that somebody with vision less than 20/200 in one eye could not drive safely. Dr. Witkin's 1992 letter laid the foundation for the later development of the vision protocol in 1994–95. In between, the matter lay dormant.

64. At least two events prompted UPS to develop the vision protocol. The first was that UPS learned that the DOT waiver program was ending. UPS was concerned about what would happen to its drivers with DOT waivers since, without a continuing waiver, they would no longer be DOT-qualified. (In this connection, it is noteworthy that eleven UPS monocular drivers participated in the DOT waiver program and successfully drove large trucks with no accidents.) The second event was the order reported at *Sarsycki v. United Parcel Service*, 862 F.Supp. 336 (W.D.Okla.1994), decided on August 31, 1994. That order, involving insulin-dependent diabetics, held that UPS could not simply apply, on a blanket basis, the DOT physical-qualification requirements to disabled drivers of vehicles under 10,001 pounds (since DOT no longer enforced the requirements for vehicles under 10,001 pounds).

65. In December 1994, Nurse Pelchat re-contacted Emory. She met with Dr. Galaid and others to discuss the development of a vision standard. She explained that the goal of UPS was to implement "medical standards that would reasonably accommodate individuals into vehicles less than 10,001 pounds when they did not meet the DOT requirements for vision." At the same time, UPS was also considering the development of a program for insulin-dependent diabetics since they too had been the subject of the DOT waiver program.

66. Dr. Witkin was re-activated for vision. His assignment was "to develop a protocol for individuals to be evaluated on a case-by-case basis by medical experts as far as their ability to operate a commercial motor vehicle under 10,001 pounds with vision that did not meet the DOT requirements."

67. The opinions expressed in his 1992 letter informed his thinking. In addition, he reviewed the following materials and studies: Rogers and Jahnke, "Performance of Visually Impaired Heavy Vehicle Operators," *Journal of Safety Research*, Fall 1992, Volume 23, No. 3; Fonda, G., "Legal Blindness Can Be Compatible With Safe Driving," *Ophthalmology*, October 1989, Volume 96, No. 10; Editorial in that same volume: Whillans & Allen, "The Ophthalmologist's Role in Licensing Drivers; Color Defective Drivers and Safety," *Optometry and Vision Science*, Volume 69, No. 6, 1992; Wood & Troutbeck, "Elderly Drivers and Simulated Visual Impairment," *Optometry and Vision Science*, Volume 71, No. 12, 1994; "Vision Standards For Commercial Drivers," *PDR For Ophthalmology*; "Vision Standards and Low Vision," *PDR For Ophthalmology*, Section 5; "Evaluation of Permanent Visual Impairment," *PDR For Ophthalmology*, Section 6.

68. Dr. Witkin did this, however, in a whirlwind. He devoted only five hours, in total, to the preparation of the vision protocol in December 1994 and January 1995.

He had only two weeks to prepare it, given the urgent deadlines imposed by UPS. He received no input from drivers or non-management employees of UPS. He sought no opinions of monocular drivers. Dr. Witkin had no data regarding UPS accidents, their frequency, or their causes. He knew that UPS had drivers operating under the DOT waiver program but did not ask to see their records. Other than UPS's Space and Visibility pamphlet, no training materials were provided to Dr. Witkin. He never asked UPS for any information when working on the protocol.

69. In early 1995, the UPS vision protocol was finalized. Dr. Witkin devised a form to be filled out by an optometrist or ophthalmologist (TX 1062) to measure four vision criteria: visual acuity, stereopsis, peripheral vision/field of view and color vision. With respect to visual acuity, an individual needed to have visual acuity of at least 20/40, corrected or uncorrected, in the better eye and 20/200 or better, corrected or uncorrected, in the other eye, to pass the protocol. This was more lenient than the DOT requirements, which called, then as now, for 20/40 or better vision in *each* eye. Anyone with vision worse than 20/200 in an eye (or without an eye) could not pass the UPS vision protocol.

70. With respect to depth perception, an individual with less than 100 seconds (a second is a small unit of arc) was supposed to use extra specified mirrors. This was not intended to bar anyone from driving but only to require the accommodating mirrors.

71. With respect to field of vision, the protocol required a "combined" field of view of at least 140 degrees. Although the protocol did not say so, Dr. Witkin intended this to mean at least 70 degrees in each eye. Peripheral vision acuity of at least 20/200 in each eye was also required.

72. With respect to color vision, the individual had to be able to identify ten of fourteen Ishihara plates.

73. The protocol (in its original form) also has two blanks to check to indicate whether the examinee was or was not "qualified" to operate a commercial motor vehicle weighing less than 10,001 pounds pursuant to the protocol.

74. The following reproduces the core of the protocol form ("OD" and "OS" refer to the left and right eyes):

| Function | Qualifying Criteria | OD | OS | Pass (Y/N) |
|---|---|---|---|---|
| Visual Acuity | Corrected Vision 20/40 in the better eye and at least 20/200 in affected eye. | | | |
| Depth Perception | Stereopsis less than 100 seconds should have additional side view mirrors including a true image size mirror and a field expanding mirror. | | | |
| Peripheral Vision | Peripheral Vision Acuity at least 20/200. Combined visual field of at least 140 degrees. | | | |
| Color Vision | Correctly identify ten of fourteen Ishihara plates and/or discriminate among red, amber, and green. | | | |

____ The above named employee IS qualified to operate a commercial vehicle weighing less than 10,001 pounds, pursuant to the UPS Vision Impairment Medical Clearance Program.

____ The above named employee IS NOT qualified to operate a commercial motor vehicle weighing less than 10,001 pounds, pursuant to the UPS Vision Impairment Medical Clearance Program.

75. The vision protocol (together with the new diabetes program) was distributed to management nationwide on June 16, 1995 (TX 1062). "The entire process," according to the cover memo, was intended as an "individualized assessment relating to reasonable accommodation under the ADA." Nurse Pelchat discussed the protocol at meetings and in conference calls with region and district medical-services managers. UPS intended to continue its use of the stricter DOT requirements for all vehicles, light or heavy, but in cases where an accommodation under the ADA might be considered, to put applicants through the vision protocol.

76. UPS did little to notify the labor force of the protocol. Greg Hunnicutt, the East Bay District Health and Safety manager, did not know of any efforts made by UPS to notify individuals generally about the existence of the vision protocol. The protocol was not published in any newsletter, nor was it posted on any bulletin board. An employee was told about the existence of the vision protocol if an employee with a vision problem expressed an interest in driving. The traditional DOT standard continued to be considered the prevailing standard. At least one claimant herein learned about the protocol for the first time at his deposition.

77. The protocol was modified in October 1996 to make two changes. References to "medical services" were changed to "occupational health." And, the places where the doctor could check off whether the employee was or was not qualified to drive were deleted. That change was made because some physicians had checked the "qualified" paragraph even though the person being tested had not passed the protocol criteria.

78. A number of other points of known confusion, however, have never been fixed. As time went on, Dr. Witkin told UPS about the confusion in the field in actual use of the form. Confusion existed, for example, with regard to peripheral vision. In establishing the criterion of combined visual field of at least 140 degrees, Dr. Witkin had meant to say that the employee had to have at least seventy degrees in *each* eye. He told UPS to tell examining doctors that the visual fields needed to be tested in each eye separately but that the seventy-degree minimums needed to be spelled out specifically, *i.e.,* that the "combined visual field" of at least 140 degrees really meant a minimum of seventy degrees in each eye. Dr. Witkin also believed that the color-vision portion needed clarification. He annotated the form to show the needed clarification and advised Nurse Pelchat of his concern. Although the protocol was otherwise modified, as stated, in October 1996, no changes were made to address the problems described in this paragraph.

79. The various points of confusion, particularly regarding the qualified/unqualified boxes, are illustrated in the stories of the individuals in this suit. After consideration of Yvonne Harbison's story, this order will return to the question of whether the criteria in the protocol have been properly validated against safe driving.

#### Yvonne Harbison

80. A central figure in this controversy is Yvonne Harbison. Ms. Harbison was a part-time utility driver before becoming a full-time driver in 1985. Her route serviced Orinda, California, out of the East Bay District. It was mostly a business route with some residential stops. Her safety record was impeccable. In 1993, Ms. Harbison lost her right eye to cancer. She was on leave until April 1995. She wanted and needed to return to work. To make matters worse, she endured a divorce, became a single mother, and her

home burned. She was well-liked at UPS and by her customers.

81. During her leave, UPS told Ms. Harbison that she would have to pass the DOT vision test in order to return to driving. UPS knew that would be impossible, given her loss of an eye. Through her union representative, Ms. Harbison asked for a waiver of the DOT test as an ADA accommodation. By letter in late April 1994, UPS denied this request (TX 1093), stating that because of the DOT rules, UPS could not grant an ADA waiver.

82. After receiving the letter, the union representative had meetings with UPS officials, including Mr. Hunnicutt, at the local grievance-panel level. That went nowhere. Then the grievance went to the national level. During the pendency of that appeal, UPS said it would consider Ms. Harbison's request to return to work driving a lighter-weight vehicle, provided UPS could take her out on a safety ride, all subject to a check with Atlanta headquarters. UPS later advised, however, that Atlanta had vetoed the idea. Ms. Harbison was then offered (and rejected) a job in the Oakland facility as a relief clerk. She persisted in her appeal.

83. In October 1994, Ms. Harbison's case reached the national panel. The union asked UPS to provide Ms. Harbison with a light-weight P500 in order for her to continue her seventeen-year driving career. The panel referred the case back to the parties for possible settlement. In March 1995, UPS offered Ms. Harbison an inside eight-hour job responding to hazardous-material spills. This job did not involve driving. When Ms. Harbison returned to work in April 1995, she took the job. There was a scare, however, when the wind splashed a hazardous chemical in her good eye, although fortunately, she was not injured. Moreover, she did not like being exposed to carcinogens.

84. Ms. Harbison never gave up on her driving request. So, in January 1995, UPS sent her for an optometric examination at the University of California. UPS told the eye doctor that she would have to meet the DOT vision standards. UPS knew that would be impossible. UPS asked for "a full written report including a projection of Ms. Harbison's increased exposure to accidents given the nature of her disability" (TX 1024). This was done at the instruction of Mr. Hunnicutt. (The protocol was still on the drawing board at this point.)

85. Following his examination, the optometrist gave Ms. Harbison an excellent report. He wrote UPS that "Ms. Harbison sees 20/20+ ... in her left eye using her current pair of bifocals ... the loss of her right eye has left Ms. Harbison with no binocular vision ... confrontation vision fields demonstrated about 90 (degrees) temporal and 45 (degrees) nasal, both normal. In summary, Ms. Harbison has excellent vision through her current pair of glasses." With respect to UPS's safety concerns, the physician stated that (TX 1023):

> [d]uring the exam, Ms. Harbison mentioned (your) concerns about her driving delivery trucks. While I cannot comment on her driving ability, I can say that she has no problems through her current prescription and that she has good acuity in her left eye. Her field of view to the right is compromised, but may be compensated for with a slight head turn in that direction. While her field of view may be a concern, again, DMV is the final authority on whether she may drive or not.

Following receipt of this letter, UPS told Ms. Harbison that since she did not pass the DOT vision requirements she would not be permitted to drive.

86. In June 1995, UPS promulgated its vision protocol. UPS then sent Ms. Harbi-

son back to the University of California Optometric Department to be examined again (TX 1028). UPS expected that she would fail the protocol because she had no right eye. Evidently, UPS wished to have a doctor certify that she was unqualified.

87. On July 7, 1995, however, the examining doctor wrote UPS that "[a]s far as I am concerned, she (Ms. Harbison) has no physical limitations which would make her unable to perform her duties as noted in the job description" (TX 1039). This was not what UPS had expected to hear.

88. Within a few days, UPS arranged to have Ms. Harbison examined again by another doctor. UPS asked him to "compare Yvonne's most recent examination with the enclosed description of her job ... as well as the United Parcel Service Vision Evaluation Program for Vision Impairments noting any recommendations and/or restrictions" (TX 1028). The new doctor concluded that Ms. Harbison failed certain line items in the protocol. Nonetheless, the doctor marked the lower part of the protocol form, which stated: "The above named employee IS qualified to operate a commercial motor vehicle weighing less than 10,001 pounds, pursuant to the UPS Vision Impairment Medical Clearance Program" (TX 1025). In other words, the doctor said that while she did not meet all of the standards, she was nonetheless qualified to drive the lighter-weight trucks. The doctor wrote in the comment section that since Ms. Harbison had no right eye, she did not satisfy the requirements but that "[s]he does, however, have excellent $^{20}\!/\!_{20}$ vision in LE [left eye] and a full field of roughly 145 [degrees] in LE [left eye] which could be aided with additional mirrors and compensating head turns to help right sided peripheral field loss caused by loss of right eye" (TX 1025). At this point, UPS's file contained three professional opinions that Ms. Harbison was qualified to drive.

89. The district human-resources manager was Bernie Collins. He met with Ms. Harbison in September 1995. Mr. Collins left this meeting with the opinion that (RT 1644):

Yvonne was everything everybody talked about. She was a very good person. She was conscientious and concerned for herself, her children but also for her job at UPS. She wanted a job at UPS. She needed the benefits. She needed the pay, but she really wanted to be a package car driver. That's really what she wanted to do... she was a good person. She just really wanted to be a driver and didn't want to be working inside, I guess, is the best way to say it.

90. On or about October 2, 1995, UPS received another letter from Ms. Harbison's eye doctor, setting out his assessment, among other things, of her vision under the UPS protocol and her ability to continue to drive. The letter advised UPS that (TX 1026):

[w]ith regard to the specific questions in your evaluation sheet clearly she does not have stereopsis and her right temporal peripheral vision would be expected to be somewhat constricted, relative to what it would be, were she to have normal binocular vision. However, I feel that at this point, she should have learned to compensate for this deficit by turning her head more than she did in the past.

I have no reason to expect that the vision in the left eye should deteriorate. I feel that Ms. Harbison should be able to return to her previously held position as a package car driver.

The only restriction which I would recommend would be that of wearing safety glasses, which is for her protection of her left eye. I assume that Ms. Harbison will be evaluated by UPS in terms of

her driving skills and I would expect her to do very well. I would see no reason from an ophthalmologic point of view, to consider placing any restrictions on her in the future and I expect that she will return to her previously held position.

Sometime after speaking with Ms. Harbison, Mr. Collins was shown this letter. Mr. Collins thought it significant that the doctor "thought that she could return as a package-car driver."

91. Finally, while an EEOC charge by Ms. Harbison was pending, UPS agreed to let Ms. Harbison return to driving. Under an agreement, reduced to writing, Ms. Harbison could drive again using trucks under 10,001 pounds. The written agreement set forth "the requirements for a reasonable accommodation for Yvonne Harbison's permanent disability, as a result of loss of vision in her right eye (monocular vision)" (TX 1080). Under this agreement, the position which Ms. Harbison occupies has been removed from the normal selection procedures. Only when she vacates that job will it be filled through the normal selection process.

92. Mr. Collins made the decision for UPS in consultation with the district labor manager and the district manager. Mr. Collins testified (RT 1647):

> We had gone through all the processes, the grievances. We had looked at all the situations with everybody there, and it really was, what was the right thing to do and where would she work best, I guess and do that, you know, with the least amount of risk to her, to UPS, and what would she do best? Where would she work best? She was a package car driver. She had been in that position. And when we went through it, it was really a matter of—it wasn't a good answer to put her back driving, but there was not—at that point any reason why we wouldn't put her back driving.

93. Mr. Collins considered as well the availability of the size vehicle that she would be driving, her seniority, her desires, safety concerns, and "what was best for Yvonne." Although his district manager was the ultimate authority in deciding to put Ms. Harbison back to work, he deferred to Mr. Collins on "what's the right thing to do in that case."

94. Ms. Harbison returned to the same route she held before she lost her eye. Her P500 weighs less than 10,001 pounds. It was transferred from another UPS facility elsewhere because no lighter-weight P500's were located in the Richmond building. At Ms. Harbison's request, the right-side mirror was replaced by a longer and thinner mirror. Ms. Harbison currently makes between 100–120 stops a day (up from 85 to 95 stops before losing her eye). In addition to the P500 assigned to Ms. Harbison, the Richmond center holds another in reserve. When she is not using the spare, it is used by others.

95. To accommodate Ms. Harbison, it has sometimes been necessary to put half of the packages for one busy retail stop on another driver's car. On some days, the stop is not on her route at all. On occasion, part of another driver's load will be put on Ms. Harbison's vehicle and she will in turn deliver the load for the other driver along with delivering her own route. Ms. Harbison generally delivers her route from 8:45 am to 6:00 p.m. Her package car goes out full most days but this does not create any problem for her delivering packages on time and in sequence. Since returning to driving in 1995, her route has grown in volume. UPS has taken note that she takes 36 minutes longer each day than expected to complete her route. Ms. Harbison has a reputation for being an excellent, hard-working, responsible UPS employee.

96. During the thirteen years Ms. Harbison drove for UPS prior to developing her vision impairment, she had no accidents. Nor has she since. She recently received a safe-driving award from UPS for eleven years of safe driving. Since she has returned to driving, Ms. Harbison has had no difficulty in applying the "Five Seeing Habits."

97. The decision to allow Ms. Harbison to return as a driver was and remains controversial within UPS. A corporate-headquarters witness from Atlanta treated the agreement as a sulphurous contract that violated the vision protocol and corporate policy. The decision, she said, was made by a "renegade" district and in "error." Locally, Mr. Hunnicutt testified that Ms. Harbison was not a safe driver, given her vision. Allen Dimmlich, a UPS risk-management chief, was not personally familiar with Ms. Harbison, but he testified that it was "a tragedy" that UPS has "somebody driving out with one eye." He believes that Ms. Harbison will eventually fail to see some children and run over them.

98. In opposing Ms. Harbison's request for accommodation, Mr. Hunnicutt researched the safety issue. He contacted the Advocates For Highway and Auto Safety and obtained driving safety material related to monocular drivers from them. That group provided a 1987 study by the California DMV entitled "Accident and Conviction Rates of Visually Impaired Heavy Vehicle Operators," by Rogers, Katz & Jahnke. That summary concluded that monocular drivers had more accidents than binocular drivers. Mr. Hunnicutt felt the article supported his safety concerns (RT 707).

99. Mr. Hunnicutt also considered difficulties monocular drivers would encounter. He believed they would be affected by depth perception and peripheral vision. Mr. Hunnicutt identified intersections as an area of concern for monocular drivers because intersections are where UPS's most serious accidents occur, and most intersection accidents are a result of drivers not following proper eye movement. Mr. Hunnicutt also identified "backing" as being an area of concern for monocular drivers (RT 711). He felt that a monocular individual would not have the same ability to judge depth perception when backing, especially with respect to the right mirror. He also identified other areas of potential difficulty. The district manager overruled Mr. Hunnicutt and allowed Ms. Harbison to return to her job. Atlanta never countermanded that decision.

100. Ms. Harbison's EEOC charge was settled after the EEOC cause determination (TX 1078). The story of Ms. Harbison, a woman of heroic spirit, nonetheless casts a long and relevant shadow over the issues of feasibility of accommodation, the use of the protocol, and the subject-matter jurisdiction of the Court.

### The Safety Issue and the Protocol

101. UPS argues that even applicants with excellent vision in one eye and excellent driving records must categorically be excluded from driving if they cannot pass the vision protocol. More individualized assessments are impossible, it maintains. This per se rule of exclusion is justified, UPS submits, on grounds of public safety. To be clear, the issue is not whether UPS can be forced to employ unsafe drivers or to dilute its safety standards. Rather, the question is whether UPS can reject candidates who are as safe or safer than the run of drivers it regularly hires. Both sides presented evidence at trial on the issue of safety and vision.

102. In this case, unfortunately, the credibility of the principal experts on both sides was severely drawn into doubt. Plaintiffs' expert was Chris A. Johnson, Ph.D., a consultant on vision requirements.

The thrust of his testimony was that monocular drivers learn to compensate for their impairment and are safe drivers. Cross-examination, however, revealed that he himself had previously recommended vision protocols more stringent than the UPS protocol for substantially similar occupations. For example, he performed a study on park rangers for the California Department of Parks and Recreation in 1994 and another on licensing-and-registration examiners for the California DMV in 1993. Both studies recommended vision protocols similar to or more stringent than the one at issue here. The Court has read his prior studies (TX 3115 at 88; TX 3116 at 93). While some differences exist between those jobs and the job here, Dr. Johnson's attempt to distinguish them was not convincing. Driving was a central concern in all of them. Plaintiffs' own expert thus established at least a rational basis for the UPS vision protocol.

103. To compound the problem, Dr. Johnson emphasized on direct and redirect examination that in all such studies he had always recommended "that there be a provision for individualized assessment for those individuals who believe that they can perform the essential job functions despite failing to meet the vision standards" (TX 1001 at 10). In fact, however, the studies mentioned contained no such provision at all (except in one but only as to color blindness). Dr. Johnson then testified that the caveats had been "inadvertently omitted." This was not credible.

104. Dr. Johnson's credibility was further strained by his contradictory testimony on the issue of whether or not monocular drivers were substantially impaired in their vision. In his expert report, he stated that monocular individuals with $20/20$ vision in one eye "are not substantially limited in the major life activity of seeing" (TX 1001 Exh. 1 at 19) (emphasis in original). Then Dr. Johnson backtracked. At trial, he said he had misunderstood what was meant by "seeing" and held that monocular individuals were, indeed, substantially impaired in the major life activity of seeing. While much of what Dr. Johnson otherwise had to say seems sound, these inconsistencies have been troubling.

105. Defendant's principal experts were no more credible. Dr. Gregory Good's main point was that monocular drivers would significantly place the public at risk of injury or death. Although this Court's standing rules on discovery required that all draft expert reports be retained and produced in discovery, they were not so produced for Dr. Good. When this came to light at the final pretrial conference, the Court ordered that they be produced. They were. A supplemental deposition followed. It revealed that substantial changes had been made from the draft to the final and that the changes were all made at the suggestion of counsel. The changes were much more extensive than Dr. Good had remembered at his first deposition (when no draft was available to test his memory) and changed the substance of the report in ten material ways. For example, his earlier report had stated that "minor difficulties with driving are reported to be overcome with conservative driving practices (e.g., increasing following distance behind cars ...)". This passage was deleted at the suggestion of UPS counsel. During talks with counsel, he wrote in the margin, "delete driving sentence!" and in another instance, "eliminate CDL [commercial-driving license] stuff" (TX 1200). In context, it seems clear that Dr. Good lost his independence and objectivity. He simply became part of the UPS advocacy team. This was further shown by contradictions between his trial testimony and his deposition testimony. At his deposition, for example, he had said "I think you can be a safe driver and show good driving technique with no stereopsis

..." (RT 2059). At trial, he waffled on this issue (RT 2020). The Court has not rejected all of Dr. Good's conclusions but has evaluated them critically in light of his strong prejudice in favor of UPS.

106. So too with Mr. Raymond Peck. Retired, he had worked for the Research & Development Branch of the California DMV for 38 years. He had directed the DMV study on monocular drivers, referenced above, called "Accident & Conviction Rate of Visually Impaired Heavy–Vehicle Operators," published in 1981. This has sometimes been referred to as the Rogers, Katz and Jahnke study, after its principal researchers. The study provided qualified support for the hypothesis that visually-impaired heavy-vehicle drivers have more accidents and convictions than do their visually non-impaired counterparts and that the difference is even stronger for the severely impaired, *i.e.*, monocular drivers (TX 1167).

107. Although the study does tend to support UPS in this lawsuit, the study is not on all fours. It dealt with heavy trucks (as well as lighter-weight vehicles). There were some empirical limits on its methodology. "There was a lack of good data" (TX 1167 at 169). More to the immediate point, Mr. Peck had in his files at home an internal unpublished DMV memorandum, prepared by researchers of the study, that drew its methodology into question (TX 1170). In preparing his draft report, Mr. Peck read the memo. He then listed it as an item he had "considered" in preparing his report. This list was part of the draft report. He sent the report to UPS counsel, stating in a cover fax "If it's OK as is, I'll mail out the original copy tomorrow" (TX 1168). After inquiring about the unpublished DMV memo and receiving a fax copy of the memo, UPS counsel then suggested to Mr. Peck that the memo be deleted from the "considered" list, supposedly because it was privi-

leged. In the final report (TX 3192, TX 1169), Mr. Peck deleted the memo from the list of items he had considered. Nor did he produce the memo at his deposition despite a subpoena covering it. The memo was never listed on a privilege log. Only after a direct order to produce the draft did the earlier list come out. That then led to the memo. A subsequent redeposition revealed the events described. Mr. Peck never contacted DMV to see if it thought the memo was really privileged. Nor did he explain why, if the memo was privileged, he had a copy of it at his home after he had left the DMV. As with Dr. Good, Mr. Peck joined in a withholding strategy unbecoming a professional. He enlisted in the UPS advocacy team and lost his impartiality.

108. Dr. Witkin, the architect of the UPS protocol, was originally listed as a UPS trial witness. During trial, a late-produced document found on his computer led to a late deposition. Then, in mid-trial, UPS withdrew Dr. Witkin as a witness. The EEOC then offered portions of the deposition. Those pages showed that UPS counsel had accepted service of the original deposition subpoena but did not tell him to search his computer files. So he produced only his hard-copy file at the original deposition in March 2000.

109. Later, in August, Dr. Witkin met in Atlanta with UPS trial counsel to prepare for trial. They discussed what he should say at trial in the event he was asked whether his 1992 work for UPS had involved the ADA (as opposed to involving only the DOT vision-waiver proposal). In this litigation, UPS has maintained that it believed the DOT safety requirements were applicable to all of its trucks, heavy and light, and thus never had an occasion to develop an ADA vision protocol until the *Sarsycki* decision in late 1994. In the Atlanta conversation, however, Dr. Witkin

stated to UPS trial counsel that he believed that the 1992 consulting work for UPS had involved not only the DOT proposal but also what vision standards UPS should adopt in light of the passage of the ADA. On the theory that his memory was unsupported by any document, UPS trial counsel then persuaded him to testify, if asked at trial, that he could not remember (Dep.489–92). He acquiesced.

110. About a month later and just before trial, however, Dr. Witkin found a 1992 memo on his computer. It was a memo from him to his department chair at Emory "Re UPS consulting job." It stated in part:

> The UPS consulting project on visual acuity requirements for Commercial Motor Vehicle (CMV) drivers was completed last month. United Parcel Service wanted information relating to visual acuity and driving because of the new "Americans with Disabilities Act" that went into effect July 26, 1992. UPS wanted to know if they could safely relax some vision requirements for their CMV drivers without increasing their liability. Currently they abide by Department of Transportation standards.

Dr. Witkin provided the memo to UPS trial counsel on September 5, 2000, the eve of trial. It was produced to plaintiffs' counsel several weeks later. The mid-trial deposition was held on October 2, 2000. The next trial day, UPS counsel announced their de-listing of Dr. Witkin. He appeared only by deposition, principally through passages offered by plaintiffs.

111. Evaluation of the expert evidence has been further exacerbated by contradictory arguments directed at different issues. UPS counsel, for example, have advanced conflicting arguments. On the one hand, they have urged that monocular vision does *not* substantially limit the ability to see and that the claimants herein have only minor vision inconvenience compared to binocular people and thus are not disabled (UPS Summary of Factual Argument 1–6). On the other hand, UPS counsel have maintained that the claimants' vision is so badly impaired they could not safely drive UPS trucks.

112. In light of these credibility problems, gaps in evidence and conflicts in themes, the Court has done its best critically to evaluate the evidence concerning the safety of monocular drivers, as follows.

113. To begin with, the Court notes well that UPS presented no expert witness to defend the actual protocol under challenge and, as mentioned, de-listed its author as a trial witness. Instead, UPS elected to litigate the grander public-policy issue of the extent to which monocular drivers are worse drivers than binocular drivers. It is worthwhile, however, to begin closer to home with the UPS vision protocol.

114. The vision protocol measures four criteria. Two fall away quickly as irrelevant. With respect to "depth perception," any individual with impaired stereopsis must, under the protocol, be provided with additional side-view mirrors but, significantly, this is *not* a disqualifying impairment under the protocol. A large amount of expert evidence related to depth perception and stereopsis, but since the protocol does not reject applicants on this ground, it recedes in relevance. The protocol also measures color blindness. This is not an issue in this case because monocularity has nothing to do with color blindness.

115. That leaves acuity or, more precisely, central-vision acuity. This measures the resolving power (or clarity) of the eye. Everyone is familiar with "20/20." It means the examinee can read at twenty feet the line of letters normally readable at twenty feet. The term $^{20}\!/_{40}$ means the examinee can barely read at twenty feet letters normally readable at forty feet.

Those with 20/200 can barely read at twenty feet what is normally readable at 200 feet. "Legal blindness" means worse than 20/200. The expert evidence in the present case demonstrates that when the acuity in one eye is poor but good in the other, the latter eye becomes dominant and the individual still has sharp central vision. As for central-vision acuity, therefore, one excellent eye is as good as any two.

116. The protocol requires, however, 20/40 in the better eye and at least 20/200 in the affected eye (TX 1062). There is no need for more than one sharp eye as far as central vision is concerned and the protocol is unnecessarily onerous in requiring more. Dr. Witkin explained (via deposition) that the acuity standard for the weaker eye was merely intended to be consistent with the separate requirement for peripheral vision, discussed momentarily. This is not, however, what the form says. Peripheral acuity is measured separately.

117. Turning to peripheral vision, the protocol requires at least 20/200 in peripheral acuity for each eye and a *combined visual field* of at least 140 degrees. Thus, two requirements are really imposed: (I) a combined field of view of 140 degrees and (ii) *peripheral* acuity in each eye of at least 20/200. If the applicant is totally blind in one eye, then he or she would have no peripheral acuity at all in the blind eye and would fail the test.

118. The loss of peripheral vision is the single largest safety problem involving monocular drivers. One eye has a side-to-side field of view that is ten to forty degrees less than for two eyes combined, depending on individual variations (TX 1001 at 5). Normal binocular vision spans a field of view of 160 to 180 degrees, whereas normal monocular vision spans 140 to 150 degrees. On each side of the field of view, there is a crescent-shaped area of coverage solely viewable by one eye. *That means the monocular driver has less opportunity to see a child or any other pedestrian or cyclist or car darting from the impaired side.* While peripheral acuity is always poor in all persons, its important purpose is to detect movement, however blurry, so that one's central vision can be directed toward the movement. In a busy urban setting where the driver is trying to find a street address or is in the thick of traffic or navigating an intersection (involving traffic from at least three directions), peripheral vision plays an important role in avoiding accidents. In this regard, the testimony of Defense Expert Dr. Loren Staplin was informative and helpful to the Court in identifying the scenarios of most concern.

119. The Court also inspected the vehicles in question. There is no rear-view mirror, as stated, in the package cars because there is no rear window. The driver cannot glance to that mirror for early warnings of hazards about to approach from the rear on one side or the other. The driver is totally dependent on glancing out of the two side windows (about 200 degrees from side-to-side measured from the face of the driver) and checking the side mirrors (about 130 degrees from left to right). The vehicles are all larger and wider than ordinary passenger cars with less all-around visibility than in ordinary passenger cars. The loss of ten to forty degrees of peripheral vision in this context is a material safety factor (absent any mitigating considerations).

120. The actual wording of the protocol requires only 140 degrees of "combined visual field." It turns out that one eye alone supplies 140 to 150 degrees (TX 1001 at 5). All parties agree on this. Perhaps aware of this fact, Dr. Witkin later testified in his deposition that he intended *each* eye to have at least seventy degrees (RT 1288). A "70 + 70" rule would have been

consistent with the DOT rule. 49 C.F.R. 391.41(b)(10). This clarification, however, has never been stated on the protocol form. The form simply calls for 140 degrees of "combined visual field." Dr. Witkin advised UPS to fix this flaw but it never did. As a result, even though UPS might well have been able to impose a more realistic field-of-view requirement, given the importance of peripheral vision to safe driving, UPS and Dr. Witkin failed to do so and actually set a standard that virtually all monocular applicants can meet—140 degrees of combined visual field. The haste with which the protocol was assembled (five hours over two weeks) probably explains this lack of care.

121. With respect to the requirement of "peripheral vision acuity at least 20/200," Dr. Witkin wrote UPS in 1992 that the maximum *normal* peripheral acuity is in the range of 20/200 (TX 35 at 2). It seems likely, therefore, that this standard might disqualify even binocular drivers, were they required to take the test. (They are not, however, inasmuch as there is no DOT counterpart to this item.) What Dr. Witkin was probably trying to get at was that the applicant should have sufficient, if blurry, side vision to detect movement (even if the eye was otherwise impaired significantly), so that the central vision could then be directed to it. There would have been a clear nexus between this notion and safe driving.

122. To summarize, the evidence would tend to support a safety-based vision standard for sharp vision in one eye and sufficient peripheral vision in the other to detect gross movement, at least as a starting point for subsequent consideration of individualized adaptations and abilities, if not on a blanket pass-fail basis. Such a standard would be less stringent than those typically imposed by the EEOC's own vision expert Dr. Johnson (TX 3115, TX 3116). In its actual execution, however,

UPS promulgated a poorly-worded form that cannot in any sense be called "carefully tailored." Again, the chief problems are:

(i) Peripheral vision is important and UPS could have, arguably, required more than it did but it chose 140 degrees of "combined visual field." Almost all monocular applicants can satisfy the 140 degrees combined field-of-view screen. If Dr. Witkin really meant "70 + 70," he should have made it clear. The form says what the form says. Dr. Witkin asked UPS to fix it but UPS never did so.

(ii) Insofar as central-vision acuity is concerned, UPS could plainly impose a requirement for excellent acuity in *one* eye. Requiring more is unnecessary for clear forward vision.

(iii) Some *binocular* individuals could not pass the 20/200 test for peripheral acuity, although UPS does not require them to take it. It is questionable whether the monocular individuals should be held to a higher standard. It is clear, however, that peripheral vision is important to driving safely and a reasonable limit in this area could be carefully tailored even if it was not in this case.

123. The protocol form was invented by Dr. Witkin from whole cloth. He spent five hours on it over two weeks (to meet UPS's deadline). It was never vetted. There was no field testing. No study was done to validate the protocol. The form hit the districts. Confusion erupted. UPS never gave adequate instructions to doctors in filling it out. Dr. Witkin saw the confusion and called upon UPS to repair the form. UPS did not—except as to one point. Doctors had been checking the "qualified" space even if the examinee failed components of the exam. This proved awkward for the company. UPS deleted the "qualified" and "not qualified"

boxes in October 1996. UPS made no other fix and has no one other than itself to blame for the crude form.

124. In lieu of a validation study, UPS cites its experts and the literature at large. A relevant study was probably the DMV study noted above. It analyzed reported accident data of severely-impaired versus unimpaired drivers of trucks of all sizes. The former had a greater accident rate but the difference was "*not* statistically significant" and "cannot be considered compelling," according to the original study (TX 3192 at ¶ 18, TX 1167 at 101). A number of variables, moreover, may have distorted the result, not the least of which finally came to light in the suppressed internal DMV memo. In reply, plaintiffs cite counter-evidence. The DOT waiver program has shown that monocular drivers with DOT waivers have experienced *fewer* accidents than other DOT-certified drivers (TX 1001 at 14). In the Court's judgment, however, the literature generally supports the proposition that monocular drivers as a whole are involved in more accidents than others as a whole but not dramatically more. At the same time, there are many monocular drivers who are actually safer than the median binocular driver. Even drivers with no vision at all in one eye can be safe, depending on their mastery of adaptation and compensation techniques. Dr. Witkin does not believe that every person who meets the protocol will be a safe driver or that every person who fails will not be a safe driver.

125. Put differently, assuming all other things are equal, driver monocularity slightly increases the risk of an accident (compared to binocularity). This is mainly because someone totally blind in one eye has less peripheral vision than a fully-sighted person. (Stereopsis, again, is not a factor in this analysis because UPS itself chose *not* to use it as a disqualifying impairment. The Court finds, in this connec-

tion, that depth perception is entirely possible despite loss of an eye. Depth cues include interposition, linear scale, atmospheric perspective diminished, and light and shadow. These cues are used by all sighted persons. Monocular individuals learn to rely on them more. Stereopsis is most important in the near field. As the distance increases, it loses importance quickly in judging depths.)

126. Critically, however, all things are not necessarily equal. Resilient, an individual losing vision in one eye normally learns to adapt and to learn alternative means for tasks such as driving safely. Regularly turning his or her head more frequently than normal will compensate for a more limited field of view. In fact, as part of its defensive-driving training, UPS already emphasizes the technique of constantly moving the head and eyes from side-to-side. To take another example, following less closely allows for more reaction time. And, placement of side mirrors further forward on the vehicle will likewise aid by narrowing the view angle needed to scan between the two mirrors.

127. Accordingly, a number of monocular drivers with excellent vision in one eye overcome their disability and are able to drive as safely as the normal run of binocular individuals. In recognition of this, almost all states allow standard driver licenses to monocular individuals and the DOT established its vision-waiver program. Other monocular drivers do not overcome their disability fully and are less safe. It depends on the individual. As with many things, there is a distribution of the degree of risk ranging from very safe at one end to very unsafe at the other. The median monocular driver may pose more risk than the median binocular driver, but both groups have many safe individuals. Many with excellent vision but only in one eye are actually safer drivers

than the median binocular driver. As a result, the Court rejects the proposition that all or substantially all monocular drivers pose a greater than average risk of accident.

128. UPS urges that it is impossible or highly impractical to sort higher-risk individuals from lower-risk individuals. The Court finds otherwise. Actually, even UPS's own expert (Mr. Peck) gave a much more qualified view, stating a combination of tests "would offer far more potential." Although he stated the "prospects of being successful are not real good, ... I don't say in my opinion it isn't possible." He himself has helped to develop protocols to grade driver risk. Dr. Staplin testified that he is helping to establish a national model program for an analogous problem: to determine which elderly people are safe to drive. One approach he described is a "tiered examination system" that would divert some subjects to "more sophisticated" examination procedures (RT 1767–68). If the elderly can be better classified by risk category, then presumably the vision-impaired can be too. In this vein, the UPS corporate fleet safety manager testified that the ability of a prospective driver in driving a UPS vehicle safely can accurately be assessed during the thirty-day evaluation period and training period. UPS evaluated Ms. Harbison on the basis of safety rides while she drove. Presumably, UPS did so because it thought the rides were probative.

129. UPS could ask a number of individualized questions of monocular applicants. The applicant may have qualified for a commercial-driving license or held delivery-truck jobs with good records at other companies such as Federal Express, local delivery companies or the post office. The candidate might demonstrate specific techniques he or she has used to overcome the deficiency. The applicant might show that he or she has successfully passed rehabilitation or specialized training. The duration of the disability (and thus the length of time the individual has had to learn compensating techniques) would also be probative.

130. In this connection, Dr. Staplin analyzed the situation and identified certain discrete driving operations that would pose heightened trouble for drivers with one eye. The one of most concern is "[f]orward maneuvers in urban settings where pedestrians or cyclists dart out in front from the far periphery." A child, for example, might dash into the street from between parked cars. This is a realistic scenario. But UPS could devise a closed driving test to simulate the danger and evaluate how applicants perform. If a simulation, for example, showed that an applicant was unable to detect darting pedestrians as safely as those otherwise accepted, then the applicant could be rejected. In a different but parallel vein, the California DMV has developed special road tests for medically-impaired drivers to assist in determining if the applicant is able to drive safely (TX 3192 at ¶ 40). It would be easier to do so here because UPS has isolated and identified the scenarios of most concern.

131. UPS is correct that it would be impossible to predict exactly which disabled individuals will or will not have accidents. But that is a truism, for it would also be impossible to make such predictions for the fully-sighted. No one has a crystal ball. What matters is whether informed and reasonable judgments can be made as to the risk factors on an individualized basis. UPS already does so for binocular individuals, taking into account DMV records, the driving test, the visual exam, the thirty-day trial driving, and so forth. Every aspect of the selection process is already otherwise highly individualized. It would not be a burden adminis-

tratively to consider the follow-up evidence set forth above on an individual basis. UPS could make risk assessments as to monocular drivers with as much precision as it already makes for binocular individuals.

### The Claimants

132. This order now turns to the pilot claimants and whether each is "disabled" within the meaning of the ADA and whether each is "qualified" to drive safely. In this connection, contrary to the view of the EEOC, the Court repeats that the ability to drive safely is an essential job function for UPS drivers. The Court re-emphasizes that the ADA does not require UPS to dilute driver safety to accommodate the disabled.

### *James Francis*

133. One of Ms. Harbison's co-workers at the North Bay hub in Richmond is James Francis. With ample seniority, he applied to become a driver but was rejected under the vision protocol. Like Ms. Harbison, Mr. Francis has no vision in his right eye, a condition he has had since birth. Unlike Ms. Harbison, however, Mr. Francis was never offered a driving accommodation.

134. Mr. Francis has the burden to prove he is disabled within the meaning of the ADA. Despite no vision in his right eye, Mr. Francis does not consider himself disabled. He testified to a wide range of activities he does without trouble, such as reading, climbing stairs, shaving, chopping wood, sawing, and playing baseball, football and basketball. His impairment does not keep him from doing anything in his day-to-day life. Nothing he does, he testified, is more dangerous as a result of his impairment. He has worked as an in-house security guard, on an assembly line operating a waffle-iron-like device, and washing dishes. He has no difficulty with tasks greater than an arm's length away.

135. On the other hand, Mr. Francis has difficulty with near-field tasks, such as putting a screwdriver on the head of a screw, putting a pot on the stove, and hammering a nail. This is because of his lack of stereopsis, which is most important in performing near-field tasks. This condition is incurable. He relies heavily on the sense of touch to supplement his vision for tasks within an arm's length. Given his total and permanent blindness in one eye and his near-field impairment to which he has never fully adapted, the Court finds that Mr. Francis is significantly impaired in the major life activity of seeing and thus is disabled under the ADA.

136. Mr. Francis was first hired by UPS on May 5, 1980, as a part-time loader at the Oakland facility. He was single and attending school at the time. His career goal was to stay with UPS. At orientation, UPS stated that if an employee made it through a thirty-day probationary period and worked four or five years as a part-time employee, he or she would build the seniority to bid for a driving job.

137. In 1984, Mr. Francis became an "irreg" driver. An "irreg" driver drives a small cart, like a golfcart, with trailers attached in the UPS building. On at least one occasion, he drove an injured employee from the facility to the hospital in a UPS Dodge Caravan.

138. Mr. Francis accrued sufficient seniority to become a full-time driver in 1984 at which time he signed a bid list to drive. A UPS manager later approached him with the list and said Mr. Francis was up for a driving position. Mr. Francis replied that he was blind in his right eye. The manager said he would "talk to the appropriate people" and get back to him with an answer. A few days later, the manager said, "Sorry, you can't drive for UPS because of our policy," explaining that Mr. Francis would not be able to pass the DOT

physical. (In 1984, the DOT test was mandatory for all UPS drivers by law.)

139. After the denial of driving in 1984, Mr. Francis continued to bid on driving jobs. UPS filled these jobs with employees with less seniority than Mr. Francis.

140. By 1988, Mr. Francis was married and awaiting his first child. His family needed more income. Mr. Francis got supplemental jobs as a car salesman, worked sporting events at the Oakland Coliseum, worked as a security guard at the Hyatt Regency, and was a computer operator at a bank. None of these jobs paid as much as his employment at UPS, where he continued as a preloader, part-time.

141. About 1990, Mr. Francis transferred out of the Oakland building to the then-new North Bay building in Richmond. He was a part-time sorter with a guarantee of three hours work daily. Mr. Francis continued to work his outside jobs after his transfer to the North Bay facility. During this time, on a typical day he would leave his home at about four in the afternoon, work at North Bay until 11:30 or midnight, drive to San Francisco to work at Imperial Bank from around midnight to six in the morning, and then drive back home. It was about a sixteen-hour day.

142. After Ms. Harbison returned to driving in 1995 and after the DOT rules were relaxed as to lighter-weight vehicles, Mr. Francis approached the union representative about an accommodation for his vision. The representative advised him he should sign the next list and express interest. If denied the job, he should call the representative and go through a grievance.

143. In October 1995, Mr. Francis signed a bid list for a part-time air-driver position (TX 1071). Two positions were available. Part-time air drivers pick up and deliver air packages from the airport or from UPS mailboxes. At the North Bay facility, the air drivers drive minivans, either Dodge Caravans or Plymouth Voyagers. The air-driver position would have been in addition to his part-time position at UPS. At the time, Mr. Francis would have been able to work the job without interfering with his regular part-time UPS job. Mr. Francis did not get either air-driving position. One went to an employee with less seniority.

144. On October 9, 1995, Mr. Francis asked UPS Manager Dave Nestor why he was not given one of the air-driving positions. Mr. Nestor said that it was because he had heard Mr. Francis would not be able to pass the DOT physical. Mr. Nestor asked Mr. Francis to step into his office to discuss the matter. Mr. Francis asked the shop steward to witness the conversation. Mr. Nestor then asked if Mr. Francis could pass a DOT physical. Mr. Francis replied that he did not know. Mr. Nestor asked, "Has anything changed with your disability?" and Mr. Francis replied "no." Mr. Nestor then said he did not see how Mr. Francis could drive for UPS.

145. Mr. Francis filed a grievance based on his denial of one of the air-driving jobs and memorialized his conversation with Mr. Nestor (TX 1074). Mr. Francis believed he should be treated like Ms. Harbison. As an accommodation under the ADA, Mr. Francis sought, and UPS understood him to be seeking, to be assigned to a vehicle which weighed less than 10,001 pounds. His grievance was filed in October 1995 (TX 1134).

146. On November 20, 1995, Mr. Hunnicutt received a copy of a memorandum advising him that Mr. Nestor had denied Mr. Francis a driving position (TX 1097). Mr. Hunnicutt was curious as to why the accommodation request was denied without involving Mr. Hunnicutt or someone else in the safety department. Mr. Hunnicutt did not, however, contact Mr. Nestor

to determine why he had denied the driving position to Mr. Francis. Mr. Hunnicutt did not ask if anyone advised Mr. Francis of the protocol.

147. Mr. Hunnicutt explained to Mr. Francis that he had the right to ask for an accommodation and that all ADA matters were handled through the safety department. Mr. Hunnicutt referred Mr. Francis to UPS Nurse Jane Alt to arrange an examination under the protocol. Mr. Hunnicutt did not ask to examine his driving record and did not ask him to undergo a road test. Mr. Francis would first have to pass the protocol before there would be any reason to allow him to take a road test.

148. Nurse Alt met with Mr. Francis, and in response to his request to be accommodated like Ms. Harbison, she told him that each case was treated individually, that there were no guarantees, that there were many people involved in making the decision, and they should get the process started.

149. On December 5, 1995, Mr. Hunnicutt met with Mr. Francis and completed a company reasonable-accommodation checklist for him. Mr. Francis' job-related physical limitation was "no vision in right eye" for which Mr. Francis asked to be assigned to a vehicle with a weight of less than 10,001 pounds as an accommodation. During his meeting with Mr. Francis, Mr. Hunnicutt did not ask him any questions about whether this vision loss could cause him any problems while driving. Mr. Hunnicutt never discussed the effectiveness of the accommodation which he requested with Mr. Francis. The reasonable-accommodation checklist was then typed and circulated within UPS management for review.

150. On December 6, 1995, Nurse Alt sent a letter to Phillip R. Mill, O.D., requesting that he examine Mr. Francis pursuant to the UPS vision protocol (TX 1033). Nurse Alt knew that a person blind in one eye could not pass the protocol. Nurse Alt enclosed most of the same materials that she had sent to physicians examining Ms. Harbison. She was told to make certain that the doctor understood the materials that had been sent to him and the nature of the job.

151. On or about December 12, 1995, Nurse Alt received the completed form from Dr. Mill. It stated Mr. Francis had light perception only in his right eye and no stereopsis, and did not qualify under the protocol. Nurse Alt informed Mr. Hunnicutt. Thereafter, she did not speak with Mr. Francis about his vision.

152. On December 14, 1995, Thomas Jensen, a safety department representative of UPS, wrote the union concerning Mr. Francis' pending grievance. Acknowledging that Mr. Francis was interested in driving a lighter-weight vehicle, the letter stated that Dr. Mill had determined that Mr. Francis was not qualified to do so. "Given Dr. Mill's opinion, and based on the UPS protocol, James is not eligible to bid on the position stated in his grievance. From a Safety Department standpoint, this issue has been resolved" (TX 1135).

153. In response, the union representative wrote on December 18, 1995, demanding equal treatment for Mr. Francis compared to Ms. Harbison (TX 1122):

> If you review the Return to Work Agreement for Yvonne Harbison you will see under Section 2C that she is covered by the same protocol as the protocol requires $20/200$ vision in the affected eye and Yvonne has no vision in the affected eye. The Company waived this requirement for Yvonne and considers her case settled although her EEOC case is still open. The sole reason Dr. Mill did not clear James under this protocol was because he is blind in one eye.

UPS appears to be applying this protocol in a discriminatory manner to James Francis. The Union does not consider this matter resolved and we will be hearing the grievance and James will be pursuing his EEOC case.

154. On December 22, 1995, the union representative wrote (TX 1130):

As we discussed on the phone, I am concerned about the company's lack of cooperation in cases such as James Francis'. A simple phone call to the doctor would have resolved this issue. To disqualify a worker without a thorough investigation and to consider the matter "resolved," as Tom Jensen's date [sic] does not show a good-faith effort on the company's part to accommodate a disabled worker. Also, the company was well aware of James' request for an accommodation on October 17.

At our grievance meeting on November 15, the grievance was discussed and the company, at that point, had not made any attempt to meet with James. On November 30, Greg Hunnicutt had a conversation with James and Lenard and again, on December 5.

Contrary to Jensen's statement in [his] letter of December 14, James was very clear about asking for an ADA accommodation from the onset of this grievance.

The above summary of events is included in this letter to point out again to the company that there is an obligation, a serious obligation on management's part, to move on these cases in a more expeditious manner and to do a thorough investigation of the facts, including the medical information.

It should not be up to the Union and the member to ferret out the facts and to point out the inconsistencies in the application of this law as it applies to our members. A more balanced approach and a more pro-active stance by the company would help you avoid EEOC and other challenges to UPS over these cases.

155. Nurse Alt was then instructed to send Mr. Francis for another full vision examination. Thereafter, Nurse Alt sent Dr. Michael Seybold the same information that she had sent to other physicians conducting these vision examinations, meeting with Dr. Seybold as well. The physician examined Mr. Francis and stated on the form that he failed. Nurse Alt advised her manager that the protocol from Dr. Seybold had been received and they needed to decide what would happen next. She was told that "powers higher than myself" would decide.

156. In rejecting Mr. Francis' request to drive, Mr. Collins, the decisionmaker in Ms. Harbison's case, relied on that portion of the protocol completed by Mr. Francis' doctor where he put a checkmark in the box stating (TX 3019):

[t]he above-named employee IS NOT qualified to operate a commercial motor vehicle weighing less than 10,001 pounds pursuant to the UPS Vision Impairment Medical Clearance Program.

Mr. Collins considered it a "big factor" in deciding to allow Ms. Harbison to return to driving but not Mr. Francis, that her doctor had stated that she would be qualified to drive and could drive whereas his doctor had said that Mr. Francis was not qualified to drive. The only data that Mr. Collins relied on concerning whether Mr. Francis was a safe driver or qualified to drive a package car was the checkmark. This is ironic because it was believed among management at the time that this very portion of the form was confusing and that doctors were mistakenly checking the boxes. Mr. Francis' request for an accommodation was never granted.

157. Nurse Alt knows of no reason why UPS would allow Ms. Harbison to drive a

vehicle weighing less than 10,001 pounds and not Mr. Francis. Nurse Alt does not know whose job it was at UPS to grant Mr. Francis an accommodation or who Mr. Francis was to ask to get an accommodation. No one has explained to Mr. Francis why Ms. Harbison is allowed to drive and he is not. Mr. Francis has asked several UPS managers and has received no explanation. Once he failed the vision protocol, UPS never made any individualized consideration of Mr. Francis' qualifications for driving.

158. The National Grievance Committee decided that the union should meet with Mr. Francis to discuss a job other than driving. On April 30, 1996, the National Grievance Committee, UPS and the local entered into a reasonable-accommodation agreement. Under this agreement, Mr. Francis was provided the opportunity to work inside the hub as a full-time hazardous-materials responder. This job is for Mr. Francis only and is not available under the normal bidding procedure. Should Mr. Francis vacate this position, it will be eliminated (TX 1072). After Mr. Francis filed a charge, the EEOC issued a cause-determination letter on May 22, 1996 (TX 1073).

159. Since 1996, Mr. Francis has not requested a driving job. There are seventeen P500's in Mr. Francis' building but only two weighing less than 10,001 pounds. One is driven by Ms. Harbison. The other is her spare. The least-senior driver on a P500 route in Mr. Francis' building has a seniority date of 1993. The average seniority of the drivers holding P500 routes is approximately 13.5 years.

160. The Court must determine whether Mr. Francis is qualified to meet the essential job function of safe driving, an issue on which he has the burden. A positive factor is the fact that Mr. Francis has had normal driving experience, although primarily in passenger vehicles.

He has done some "irreg" driving within the UPS facility in a small cart. Since 1974, he has not had a moving violation and has been licensed to drive in California. He has had a long time to learn compensating techniques.

161. On the negative side, given his disability, Mr. Francis has a loss in peripheral vision on his right side. This poses a risk that he can be blind-sided on the right (even when the accidents are not his fault). In fact, there have been two such accidents. At age sixteen, he hit a car on his right side (although he tried unconvincingly at trial to state that it had occurred on his left side and was impeached with his deposition statement). To be sure, he testified that it was not his fault. But that is not the only issue. UPS seeks operators who can drive defensively and avoid accidents regardless of fault. Significantly, another blind-side accident recently occurred on his UPS job. Mr. Francis was driving an "irreg cart," going straight ahead. He saw a package car ahead and to his right in the car-wash unit. It was not yet backing out. He continued ahead. As he passed the unit, the truck backed out and hit Mr. Francis' cart on the passenger side. The package car backed into his cart at a ninety-degree angle (like a "T"). The accident happened as though the package car was coming out of a side street (RT 146–47). Mr. Francis was looking straight ahead and did not see it coming (RT 145–47, 158). The Court finds the accident would normally have been avoidable for a driver with peripheral vision on his right side. Certainly, Mr. Francis has not proven that the accident was unavoidable. Furthermore, Mr. Francis has offered no evidence of any conservative driving techniques to compensate for his disability. In light of his two accidents, both on his right side, the Court is left in grave doubt whether he has compensated for his disability suffi-

ciently to meet the safe-driver standard. Mr. Francis has not proven that he meets the essential job requirements of safe driving. Accordingly, his claim for relief will be rejected.

### Shawn Hogya

162. Shawn Hogya has worked for UPS for ten years and is currently a part-time "sorter" at the Petaluma center. Mr. Hogya is legally blind in his left eye, having been hit by a baseball in that eye when he was fourteen. His central-visual acuity in this eye is $20/200$ or worse. Mr. Hogya has, however, useful sight in that eye at the periphery. He detects form in his peripheral field of view. When looking forward with both eyes open, Mr. Hogya is not aware of a blind spot in his vision. His vision loss cannot be corrected by glasses and is permanent.

163. Mr. Hogya mountain-bikes, water-skis, golfs, races Indy-style go-carts, shaves, dries his hair, shoots rifles, snow-boards, hikes and chops wood. He can even tie fishing flies. His day-to-day life is not affected. He has worked as a roofer and a butcher (but wore a steel glove as a precaution). He stated, "I have learned to adapt to it over the years" (RT 980).

164. Because of his degraded vision, he is slower at tasks within arm's length. While working around his house installing sheet rock, he has some difficulty judging whether or not screws are going in straight. While using a hammer he must look at the nail from the side to make certain he is hitting the nail straight on. As he observes himself in comparison to others, he notes that he does not do things as fast as other people or as well.

165. Mr. Hogya is also more careful when he engages in certain activities such as hiking and playing with children. As noted, he is a fly fisherman. It is difficult for him to focus on fine materials close-in, such as fly-fishing line, as opposed to rope, which is much easier for him to handle—but this is true for everyone. After his accident he had to develop alternative methods for tying knots. He still can tie a fly to a thin lie. "After the accident," he testified, "I had to train myself to do things, and even though I feel that I trained myself to do most of the things that I do everyday in my life, there's always something new that comes up to me that is different for me, and it does place a difficulty on me." As a result, Mr. Hogya considers himself to be disabled.

166. Nonetheless, Mr. Hogya's deposition made clear that he has adapted almost completely to his impairment and that it barely interferes with his ability to see. Although that testimony was given at a time when plaintiffs felt they could rely on a per se rule of disability for monocularity, a rule later overturned by the United States Supreme Court, the testimony must nonetheless be credited. Accordingly, under the standards set by the Supreme Court discussed below, the Court finds that Mr. Hogya is not in fact substantially limited in the major life activity of seeing. The Court hereinafter finds, however, that UPS "regards him" as so limited and that he is therefore "disabled" within the meaning of the ADA.

167. When Mr. Hogya was first hired by UPS, there was not full-time work for him. At his interview, he was told that if he wanted to become a driver he would have to work the morning shift for about four years to earn enough seniority to become a driver. Mr. Hogya told UPS about his vision at the time he was hired. He wanted to make sure that it would not have a problem with his vision and that he could ultimately get a driving position. UPS told Mr. Hogya that all he needed was a California driver's license with no restrictions.

168. Early on, he applied to become a utility driver, part-time. Mr. Hogya sub-

mitted letters of interest for becoming a package-car driver in January 1993 and in January 1994. He had sufficient seniority. His 1994 letter went to Susan Knobelauch, the UPS human-resources representative at the Petaluma center. She asked him to bring in a copy of his DMV printout. He did. UPS then arranged for him to have a road exam in a P800 with a supervisor. (A P800 is larger than a P500 and holds 800 cubic feet.) He passed. The supervisor "certified" that Mr. Hogya "was given a road test under my supervision on 3–31–94 consisting of 10 miles of driving. It is my considered opinion that the driver possesses sufficient driving skill to operate safely the type of commercial motor vehicle listed above." After the road test Mr. Hogya gave a copy of the certification portion to Ms. Knobelauch. She said he had passed. He had never before driven a UPS vehicle.

169. Ms. Knobelauch then scheduled the DOT physical. He went and was tested. He was told by the doctor to return to Ms. Knobelauch. She then told him that he could not drive for UPS because he failed the vision segment. A less senior applicant got the job.

170. Mr. Hogya spoke to his union agent about filing a grievance. The union agent, however, said there were no grounds. Mr. Hogya then frequently spoke with Ms. Knobelauch, asking her if there was some way for him to drive. Mr. Hogya asked many times if there was anything else he could do to get full-time work. She replied that the only future he had with UPS would be as a part-time employee and that UPS would not allow him to work two shifts as an accommodation.

171. At one point, Ms. Knobelauch said that if he went to an eye doctor and the doctor passed him and said he could drive a UPS vehicle safely, then Mr. Hogya could drive. Mr. Hogya was then examined by Dr. Roger Weeks, who gave him a letter dated April 22, 1994, stating in part: "I do not feel his visual field defect significantly detracts from his ability to drive safely." Mr. Hogya personally delivered this letter to Ms. Knobelauch. She said that Dr. Weeks was not a good enough eye doctor for UPS.

172. On January 31, 1995, Mr. Hogya filed his EEOC charge and his California DFEH charge (TX 1081, TX 3040). He was not told of the protocol until well after he filed his EEOC charge.

173. In April 1996, Mr. Hogya was examined under the vision protocol by Dr. Weeks. He was informed that he failed in March 1998 (TX 1158) and arguably earlier as well. Dr. Witkin received a copy of the protocol for Mr. Hogya and concluded that, although Mr. Hogya evidently failed the protocol, Dr. Weeks' entries in the boxes indicated that Dr. Weeks was confused. Dr. Witkin was concerned that perhaps Dr. Weeks had not completed the form correctly, so he recommended a second examination.

174. That led to a further protocol examination in January 1997 by Dr. Sandra Lee. Dr. Witkin spoke with her and tried to explain the areas that had been confusing. Even so, Dr. Lee still did not complete the form properly. Mr. Hogya failed the central-vision acuity module. Dr. Witkin did not believe Dr. Lee properly examined Mr. Hogya under the protocol. Dr. Witkin told Nurse Pelchat that he would like to examine Mr. Hogya but UPS never arranged it.

175. Sometime late in 1996, Ms. Knobelauch was told by management that UPS had vehicles that did not require a DOT physical. Ms. Knobelauch was told not to talk about these vehicles. Ms. Knobelauch was specifically told not to tell Mr. Hogya about these vehicles. Ms. Knobelauch complied with this instruction. Nor did

she tell Mr. Hogya about Ms. Harbison's case, although she had been told about it.

176. With respect to his qualification, Mr. Hogya holds a valid California driver's license. In the past ten years Mr. Hogya has never had a moving violation. He has never had any difficulty while driving because of his vision. Mr. Hogya took the UPS road test on March 31, 1994, with a full-time manager who told him that he was very impressed with his driving.

177. Mr. Hogya has been in two accidents. The Court has considered both. Neither in any way suggests that Mr. Hogya is not a safe defensive driver. In one, his car rolled one foot and bumped another car at a fast-food parking lot. In the other, a driver ran a stop sign and hit Mr. Hogya's car. Mr. Hogya saw the driver at all times and reacted defensively. The accident was unavoidable. The Court finds that Mr. Hogya has demonstrated that he is and was sufficiently qualified to at least proceed to the advanced UPS course work and training. If that phase raises questions concerning his ability to drive safely, then, of course, UPS would be free to re-evaluate Mr. Hogya based on all the evidence.

178. In 1998, Mr. Hogya asked to be assigned to a lighter-weight full-time delivery route. In his building in Petaluma, there are no light-weight P500's. There are two P32's, each driven by operators with longer seniority than Mr. Hogya.

### Stephen Ligas

179. Stephen Ligas works for UPS in Orlando as a preloader. When he was ten, he had an accident that resulted in the severing of the optic nerve in one of his eyes. The vision in Mr. Ligas' right eye is between $^{20}/_{200}$ and $^{20}/_{400}$ and is uncorrectable. The vision in his left eye is 20/15. Using just his right eye, objects in front of Mr. Ligas are blurry. He is able to detect light using his right eye only at far distances. Mr. Ligas has limited peripheral vision in his right eye.

180. Mr. Ligas has problems judging depth within five feet, but not at distances further than that. For example, Mr. Ligas has difficulty aligning a toothpaste cap on the tube, tying shoe laces, climbing up and down stairs, putting keys in a lock. Otherwise, his impairment does not substantially affect his ability to see. When working with tools, Mr. Ligas takes the special precaution of wearing safety goggles to protect his eyes. He feels safer when he is wearing them. In order to do near-field tasks Mr. Ligas focuses on the task and relies not on his vision but on "hand-to-surface feel."

181. Mr. Ligas was in a wrestling program in high school but quit because of the danger of getting hit in his unimpaired eye (RT 747–48). Mr. Ligas plays racquetball and golf and has adapted to his impairment with the exception of near-field tasks. He does not consider himself disabled. He feels he is able to do everything that people with two unimpaired eyes are able to do "if I use my methods" (RT 827). Significantly, however, those methods for the near field do not involve vision but involve "hand-to-surface feel." For the legal reasons stated hereinafter, the Court finds that Mr. Ligas is substantially limited in the major life activity of seeing. (Moreover, UPS regards him as disabled, for the same reason as it so regards Mr. Hogya.)

182. Mr. Ligas has worked for UPS for fifteen years. Currently, Mr. Ligas works at UPS in Orlando from 3:00 a.m. to 7:30 a.m., Monday through Friday, and from 8:00 a.m. to 6:00 p.m. at Ameriserve (his second job) on Friday through Monday. His first job at UPS was loading and unloading. He has also worked in small sort and has done irregular driving.

183. Mr. Ligas has sought driving positions at UPS on three occasions. The first time was in June 1989 when he bid for a part-time air-driver position. At that time, there was a bid list for a total of twelve openings. The air-driver position allowed an employee to work his part-time job and drive part-time air. The air driving was in the vans, P500's and sometimes in P800's.

184. Mr. Ligas was selected for one of the twelve positions based on his seniority. Mr. Ligas took and passed a road test in a P800. The road test included driving and backing in urban and rural areas, on a four-lane highway, side streets and dirt roads. After the classroom training, the written exam and the driving test, Mr. Ligas was sent for a physical. Mr. Ligas was told that he did not pass. That was that. Years went by.

185. In June of 1996, Mr. Ligas signed another bid list to drive part-time air. At all times since 1996, there have been vehicles weighing less than 10,001 pounds in use at the Orlando building. Mr. Ligas had the seniority. He, however, did not get any of the air-driver positions in 1996. The three individuals who did had less seniority. The obvious reason was his eyesight.

186. One night at work, Mr. Ligas noticed a posting of a questionnaire on how to ask for accommodations. Using the form Mr. Ligas filled out an "accommodation request under the ADA." Mr. Ligas never received a response. He filed a grievance, writing "On October 25, '96, I wrote a letter asking for accommodations under the Americans with Disabilities Act." No one from UPS ever came back and told Mr. Ligas that it never received his letter.

187. Between September of 1996 and January of 1997, Mr. Ligas applied for the position of cover driver, part- or full-time. He had sufficient seniority but did not get

it. On February 25, 1997, Mr. Ligas saw a bid list for an early-morning driving position. He noticed the listed requirements for the job and asked his supervisor for a copy of the document. He was given a copy. He wrote a note on the back asking for an explanation regarding the requirement of a "company" rather than "DOT" physical. He returned the document to his supervisor and asked him to turn it into management.

188. In September 1996, UPS received a letter from Mr. Ligas' eye-care physician notifying UPS that Mr. Ligas' visual acuity is 20/400 in his right eye. UPS wrote (TX 3054):

> I received a letter from Dr. Ball, an eye physician caring for Stephen Ligas. Stephen is a part-time emp trying to qualify into a driving position. His doctor indicated visual acuity of 20/400 in the right eye and 20/15 in the left. Under DOT, he does not qualify. I have reviewed the reasonable accommodation procedure for vision and the UPS policy states that to qualify, he must have a least 20/200 in the better eye. Stephen does not meet this qualification. This letter from the doctor was sent to Everett Street as well but, I want to run it past you before I call this employee. I have spoken with the doctor and confirmed that the best corrected vision they can get is 20/400. I say he does not qualify even to drive vehicles under 10,000 lbs. Let me known what you think. Thanks Judy.

189. In September 1996, Mr. Ligas filed a union grievance over the part-time air-driver position. On November 8, 1996, the Teamsters determined that there was no contract violation. On March 31, 1997, Mr. Ligas filed a charge of discrimination with the EEOC. The EEOC later issued a letter of determination and a letter regarding the failure of efforts to conciliate.

190. The Court finds that UPS denied Mr. Ligas all driving opportunities solely on account of his vision (even though he was never told about the vision protocol). UPS never discussed any accommodations with him. He was not even aware of the vision protocol until his deposition on December 5, 1998.

191. In the Orlando building, there are four P500's used on bid package-car routes. Each weighs more than 10,001 pounds. The four drivers who hold the bid routes in P500's in the Orlando building have seniority dates that range from the early 1970's to the mid 1970's, *i.e.*, more seniority than Mr. Ligas. In the Orlando building, there are no package cars smaller than P500's on any bid routes. In the Central Florida district, there are thirty non-DOT P500's.

192. With respect to Mr. Ligas' safety qualifications, the evidence is mixed. On the one hand, Mr. Ligas has had a Class D driver's license since 1989. This allows him to drive vehicles up to 10,000 pounds in Florida. Mr. Ligas worked full-time for an office-products firm for a total of four years driving a commercial van and a flatbed truck. He had no accidents. He also worked full-time for a coffee service for three years driving commercial vans and a one-ton box truck. Mr. Ligas drove these vehicles on the public highways around Orlando, including on freeways, side streets, main streets and in alleys. He had to back up in the vehicles, park them, and load and unload them. Mr. Ligas never had an accident or received a traffic citation while working for either company. Mr. Ligas claims his vision does not affect his ability to drive at night, in the rain or in the fog.

193. On the other hand, Mr. Ligas has been in one potentially serious and recent auto accident. Not long ago, he made a left turn at a busy intersection and, shortly after completing the turn, rear-ended a car

stopped to make a further turn. The accident was his fault. He followed too closely. He was so cited. No one was injured, but that was fortuitous. Someone could easily have been injured. Conceivably, the accident reflects on Mr. Ligas' impaired vision. Whether it does or not, it raises a significant risk factor. Combined with the risk implicated by the impairment itself, or considered in isolation, the driving accident is most troubling. Mr. Ligas has failed to carry his burden to prove that he can meet the essential job requirement of safe driving.

194. Orlando is in a different region and the following facts fill out some of the detail given earlier for California. In Florida, Alabama and other parts of the South, full- and part-time UPS employees represented by the Teamsters are covered by the Southern Regional Supplemental Agreement ("Southern Supplement") in addition to the National Master Agreement. The Southern Supplement applies to UPS mechanics in that region (TX 2 at 151). Under the Southern Supplement, all package routes are put up for bid twice during the term of the union contract. During each such bid, all routes are fair game for drivers at the center. When a new route is created, all drivers at the center may bid. Seniority is the rule of decision. So too when a route is vacated by a driver (due to retirement, promotion or the like), but the route may be bid by all drivers in the building, which can include several centers. And, a senior driver has the right to take away a route held by a more junior driver, even if the junior driver has been driving the route for several years.

### Raymond Brown

195. Raymond Brown has been employed by UPS as a full-time mechanic in Dothan, Alabama, since 1976. The issue with Mr. Brown is different from the other

claimants. Incident to his duties, UPS allows him to test-drive vehicles under 10,-001 pounds. (He passed the protocol.) UPS will not allow him to drive the heavier vehicles, however, because he does not have a DOT card. The EEOC contends that he does not need a DOT card on the theory that mechanics do not drive trucks in "interstate commerce" and therefore DOT lacks jurisdiction. For the reasons set forth at the end of this order, however, Mr. Brown's claim is outside the proper scope of this lawsuit, thus eliminating the need to make findings as to him.

## ANALYSIS AND CONCLUSIONS OF LAW

In light of the foregoing findings, this order now makes the following conclusions of law.

### Disability

The ADA protects only the disabled. An impairment is not sufficient to trigger the ADA unless the impairment substantially limits a major life activity or is "regarded" by the employer as being so limiting. 42 U.S.C. 12102(2). Plaintiffs contend that "seeing" is the major life activity at issue here, having abandoned "working" as an alternative ground. UPS contends no claimant herein is "disabled" within the meaning of the ADA.

■ Preliminarily, one might ordinarily think that someone who had lost an eye would be disabled, but a per se rule of disability for all monocular individuals, which had been adopted by the Ninth Circuit, was rejected in *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). Instead, an individualized assessment of disability, case by case, was required by the Supreme Court:

[Monocularity], as we understand it, may embrace a group whose members vary by the degree of visual acuity in the weaker eye, the age at which they suffered their vision loss, the extent of

their compensating adjustments in visual techniques, and the ultimate scope of the restrictions on their visual abilities.

\* \* \* \* \* \*

This is not to suggest that monocular individuals have an onerous burden in trying to show that they are disabled. On the contrary, our brief examination of some of the medical literature leaves U.S. sharing the Government's judgment that people with monocular vision "ordinarily" will meet the Act's definition of disability, Brief for United States, et al., as *Amici Curiae* 11, and we suppose that defendant companies will often not contest the issue.

*Id.* at 566–67, 119 S.Ct. 2162. Such an individualized approach leaves open the possibility that two persons with identical vision impairments might be treated differently, one deemed disabled and the other not, depending on the extent of their compensating adjustments.

The only compensating adjustments that count, however, are those that assist in *seeing itself*, not in other measures taken in mitigation of the loss. The Supreme Court referred to "the extent of their compensating adjustments in *visual techniques*" and the "scope of the restrictions on their *visual abilities.*" *Id.* at 566, 119 S.Ct. 2162. Thus, a touch-and-feel substitute for stereopsis does *not* improve vision itself any more than braille would cure blindness. *Finical v. Collections Unlimited, Inc.*, 65 F.Supp.2d 1032, 1041 (D.Ariz. 1999). Accordingly, the fact that claimants lead normal lives proves little. The focus must be on vision and any vision techniques used to overcome the deficiency.

■ Before *Kirkingburg*, plaintiffs in this lawsuit relied on the per se approach and all claimants testified in their depositions so as to minimize their impairment and to maximize their driving qualifica-

tions. Then came *Kirkingburg*, forcing claimants to reverse field and to allege "seeing" limitations while staying within the bounds of their prior depositions. Based on their deposition admissions, however, UPS succeeded in showing at trial that all claimants lead normal lives except as follows: All claimants have difficulty in performing near-field tasks, such as, to take only one of numerous examples, guiding the blade of a screwdriver to the slot in a screw head. Yet that one broad problem can be large. For at least Mr. Francis and Mr. Ligas, the condition seems permanent and not a minor inconvenience. While honest differences of opinion might exist over the issue, the Court finds that the near-field vision deficiency caused by a loss of stereopsis is a "substantial" limitation on the major life activity of seeing, and that Mr. Francis and Mr. Ligas have not learned compensating visual techniques sufficient to mitigate the problem. They are, therefore, disabled within the meaning of the ADA. Mr. Hogya, however, has adapted through visual techniques, even as to the near-field tasks, based on his deposition admissions set forth in the findings.[2]

Interestingly, the loss of stereopsis, the only way in which claimants' seeing is substantially limited, is specifically *not* a ground for disqualification under the vision protocol. This would raise an interesting question as to their eligibility for relief were it not for the conclusion, next following on an alternative ground, that all claimants are disabled within the meaning of the ADA.

\* \* \* \* \* \*

■■■■ All claimants are "disabled" within the meaning of the ADA because UPS "regarded" them as having an impairment that substantially limited their

seeing. 42 U.S.C. 12102(2)(C). *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), recognized two ways in which individuals may fall within this statutory definition: (1) an employer mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both instances, it is necessary that the employer entertain misperceptions. The inquiry focuses upon the attitudes and motivations of the employer. If an impairment at a certain level of severity would constitute a disability, then it follows that an employer who perceives an applicant as having such an impairment perceives him or her as disabled. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3rd Cir.1999).

UPS has a corporate-wide, deeply-entrenched conviction that drivers with only one good eye are unsafe at any speed in any UPS vehicle. Well before the vision protocol was promulgated in June 1995, UPS knew that DOT was no longer enforcing its vision standards for vehicles under 10,001 pounds. In 1992, Dr. Witkin advised UPS that there was no factual basis for continuing to insist that all operators meet DOT standards (TX 35). Specifically, he advised UPS that it could prudently reduce the visual-acuity requirement in the affected eye to 20/200; that individuals without stereopsis could operate commercial motor vehicles without undue danger; and that sound driving only requires a combined visual field of 140 degrees. Nonetheless, UPS continued its policy for three more years. When UPS did relax its standards in 1995 via the protocol, it

---

**2.** For somewhat similar circumstances and a finding of no disability under the Rehabilitation Act, 29 U.S.C. 701, *et seq.*, despite the

type of near-field difficulties presented here, *see Sherman v. Peters,* 110 F.Supp.2d 194 (W.D.N.Y.2000).

did so not as an across-the-board change but only as to those employees bold enough to inquire about an accommodation. UPS did very little to notify its workforce of the change. The record shows no one who passed the protocol and went on to become a driver.

No accidents mar Ms. Harbison's seventeen-year service for UPS, five of which have been with but one eye. Despite her safety laurels, every UPS official (save Mr. Collins) who testified about her said she was dangerous. Mr. Hunnicutt so testified. Corporate Nurse Pelchat went so far as to say allowing her to drive had been an "error" committed by a "renegade" district (although Atlanta never countermanded the decision). And, Allen Dimmlich, former UPS manager of corporate risk management, testified that a monocular individual cannot be a safe driver. He was convinced, based on "common sense," that it is only a matter of time until Ms. Harbison runs over children. He added that a monocular driver cannot be trained to see everything they need to see when they need to see it. These dark suspicions of cataclysmic harm, universally applied to all monocular applicants, are mistaken, for some monocular drivers train themselves to be as safe as the average binocular driver.

UPS, moreover, even labeled Ms. Harbison as "disabled." This was the term used in UPS's written agreement setting forth the reasonable accommodation, stating she was "considered permanently disabled, as a result of loss of vision in her right eye (monocular vision)" (TX 1080). When UPS sent her for an exam, Nurse Alt asked for a risk assessment "given the nature of her disability" (TX 1024). A supervisor asked Mr. Francis, when he re-inquired about driving, "Has anything changed about your disability" (TX 1074). Ray Brown was given the stall on his request for assistance to obtain a vision

waiver. Finally, management told him there would be no cooperation because management "was not going to have UPS liable in case" Mr. Brown was in an accident (RT 1216–17). In short, bark to core, UPS has mightily resisted the prospect of any applicant with only one good eye ever sitting behind the wheel of a UPS vehicle. Its resistance is rooted in an article of faith that all such applicants are substantially limited in seeing and, in turn, in driving. To categorically sweep the safe out with the unsafe, when less blunt measures are available, constitutes the type of stereotypical prejudice the ADA sought to end. Sen. Rep. No. 101–116, 101st Cong. 1st Sess. at 37 (1989).

### Essential Job Function

UPS contends no claimant has shown he is qualified to drive safely. The UPS memorandum listing the "essential job functions" for all drivers includes the ability to "see . . . with sufficient capability to perform assigned tasks and maintain proper job safety conditions . . ." (TX 3075). It further requires "cognitive ability" sufficient to "illustrate spatial awareness" (*ibid.*). The ADA requires that "consideration shall be given to the employer's judgment as to what functions of a job are essential." If an employer "has prepared a written description," as here, "before advertising or interviewing applicants for the job," then "this description shall be considered evidence of the essential functions of the job." 42 U.S.C. 12111(8).

The EEOC contends that the ability to drive safely is not an essential job function for a truck operator (EEOC Post–Trial Br. 17–18). It says that driving is essential but driving safely is not. This argument is a necessary by-product of the EEOC's strategic view of the business-necessity defense, considered below. However that may be, this order holds

that the ability to drive safely *is* an essential job function for any professional driver employed by a company like UPS. Furthermore, UPS is entitled to set a high safety standard, all agree herein, so long as it applies equally to all. *See* 29 C.F.R. 1630.2 app., cmt. n. In light of this order's recognition that safe driving is an essential job function for the positions at issue, this order further holds, for the reasons set forth above in the findings, that Mr. Francis and Mr. Ligas have not shown that they are qualified (given their accident histories) but that Mr. Hogya has proven that he is sufficiently qualified to proceed to the next level of advanced training and testing offered by UPS.[3]

### FEHA

■ In light of the holding that plaintiffs were "regarded as" disabled under the meaning of the ADA, this order need not reach the question of whether California FEHA's disability definition requires substantial limitation of a major life activity. *Cassista v. Community Foods, Inc.*, 5 Cal.4th 1050, 22 Cal.Rptr.2d 287, 856 P.2d 1143 (1993), is the primary case defining "disability" as utilized under the California FEHA. Because the plaintiffs satisfy the disability definition under the ADA, under any reading of *Cassista*, plaintiffs also satisfy the definition for the purposes of the FEHA. The resolution of all FEHA claims will be deemed to follow the resolution of all ADA claims.

### The Vision Protocol and the ADA

This order now turns to the primary legal issue in this case, namely the extent to which a blanket safety-based qualification standard can be used categorically to deny jobs to disabled applicants even though at least some would be fully able to perform the essential job duties safely. Given *Kirkingburg*, it is common ground among the parties that as to vehicles over 10,001 pounds, the DOT safety regulations reign supreme. Sen. Rep. No. 116, 101st Cong., 1st Sess., at 26–27 (1989). This case involves only applicants to drive vehicles under the threshold DOT limit.

The ADA prohibits employment discrimination based on disability and defines "discrimination" to include:

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in

---

**3.** Nothing in *Echazabal v. Chevron U.S.A., Inc.*, 226 F.3d 1063, 1070–72 (9th Cir.2000), is to the contrary. In fact, that decision repeated the Supreme Court's statement that "[i]t is word play to say that 'the job' at Johnson [Controls] is to make batteries without risk to fetuses in the same way 'the job' at Western Air Lines is to fly planes without crashing." *Id.* at 1071 n. 9 (quoting *Int'l Union v. Johnson Controls, Inc.*, 499 U.S. 187, 207, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991)). Here, driving without accidents *is* like flying without crashing.

question and is consistent with business necessity;

42 U.S.C. 12112(b)(5) and (6).

The ADA further mirrors these provisions by allowing a "defense," as follows:

It may be a defense to a charge of discrimination under this chapter than an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

§ 12113(a). In the present case, no one doubts that the UPS vision protocol "tends" to screen out applicants with vision disabilities. The statutory question reduces to whether the protocol "has been shown to be job-related and consistent with business necessity" and whether "such performance cannot be accomplished by reasonable accommodation."

This, the parties agree, raises a legal issue of first impression. They advance diametrically opposing constructions. Plaintiffs contend that no qualification standard is valid unless the employer proves that *every* disabled applicant who might fail could not perform an essential job function (with or without an accommodation). Their construction is based mainly on the final clause that reads "and such performance cannot be accomplished by reasonable accommodation ...." Accommodation, plaintiffs say, is an inherently individualized inquiry and is inconsistent with blanket qualification standards.

On the other hand, defendant UPS replies that the "performance" referenced simply means performance of the *test* itself, not performance of the *essential job function* for which the test is a proxy. Any test bearing any "logical" correlation

to an essential job function may serve as a proxy therefor, UPS maintains. Where no accommodation could allow disabled applicants to pass the test itself, then UPS maintains that the test is lawful. For claimants with a permanent loss of central vision in one eye, to take an example, no accommodation would enable them to see better in that eye and thus pass the vision exam in question. Under this construction, a vision standard would be lawful even if it rejected many applicants with excellent vision in one eye, with excellent driving records, and with excellent driving abilities.

No caselaw has yet addressed the question save a partial answer by the Fifth Circuit. It recently held that a safety-based qualification standard must be judged under the "business necessity" rubric rather than under the "direct threat" rubric, rejecting a requirement for individualized determinations under the "direct threat" provision. Section 12113(b) provides that qualification standards may include a requirement that an individual not pose a direct threat to the health or safety of individuals in the workplace. *EEOC v. Exxon Corp.*, 203 F.3d 871 (5th Cir.2000). The court, as stated, held that blanket safety standards should be judged under the business-necessity test. The Fifth Circuit had no occasion to detail the full contours of "business necessity." Nonetheless, for guidance on remand, the Fifth Circuit stated:

In evaluating whether the risks addressed by a safety-based qualification standard constitute a business necessity, the court should take into account the magnitude of possible harm as well as the probability of occurrence. The acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position

involving atomic reactors, for example. In short, the probability of the occurrence is discounted by the magnitude of the consequences.

203 F.3d at 875. The decision did not examine or consider the "reasonable accommodation" clause of the defense. The result in *Exxon* is inconsistent with the EEOC's view that blanket safety-based-qualification standards are illegal.[4]

The Ninth Circuit has not yet spoken. Under the progenitor of the ADA, the Rehabilitation Act, 29 U.S.C. 701, *et seq.*, the Ninth Circuit held that the Act set "a high standard for the effectiveness of job qualifications that adversely affect the handicapped ... The courts must be wary that business necessity is not confused with mere expediency." A "blanket" job qualification must be job-related and "must substantially promote" business necessity and safe performance. This decision was based on implementing regulations by the Secretary of Labor that read much like the business-necessity defense at issue here. 29 C.F.R. 32.14 (1982).[5] The Ninth Circuit held that there was only weak and inadequate evidence to justify the covered entity's blanket rule requiring that diabetics demonstrate consistent "control" of their blood-sugar levels. *Bentivegna v. United States Dept. of Labor*, 694 F.2d 619, 621–23 (9th Cir.1982). The court made clear, however, that a "non-imminent

risk of injury" might justify a safety standard for jobs entailing "elevated risks of injury" but had no occasion to explore that issue on the facts before it. *Id.* at 623 n. 3; *see also Mantolete v. Bolger*, 767 F.2d 1416 (9th Cir.1985). Despite a wealth of ADA decisions by the Ninth Circuit, none has otherwise addressed the issue under the ADA. Nor has the Supreme Court.[6]

From a larger perspective, employment decisions under Title VII and the Age Discrimination in Employment Act illuminate the landscape. Two broad and different features deserve consideration: the business-necessity defense and the BFOQ defense. The latter was created by statute and is implicated when an employer uses age or gender as an express classification, as in a mandatory retirement age. For example, in *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985), the Supreme Court struck down an airline safety requirement that all flight engineers retire at age sixty. Although the FAA had imposed a mandatory retirement for pilots at the same age, the Court held that flight engineers were under no such FAA requirement. It upheld a verdict based on the airline's failure to prove the rule was "reasonably necessary to the normal operation" of the airline. The ADEA provided that an age classification was lawful "where age is a

---

4. UPS notes that the Eleventh Circuit has upheld the suspension of a police officer found to be paranoid, hostile and/or oppositional, and cautioned that the ADA does not require a police department to forego fitness examinations and wait until disaster strikes before suspending an irrational officer. Significantly, however, that case involved an individualized determination, not a blanket safety standard. *Watson v. Miami Beach*, 177 F.3d 932, 935 (11th Cir.1999).

5. The Rehabilitation Act did not and does not include an express statutory business-necessity defense.

6. Although DOT safety standards for drivers were involved in two of the Supreme Court's trilogy of ADA decisions in 1999, and UPS was a party in one, none of them addressed the issues presented here. One of those decisions held that the ADA cannot override the DOT vision requirements applicable to vehicles over 10,001 pounds. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). Here, in contrast, the DOT standards do not apply by their terms to vehicles under 10,001 pounds. *See also Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (construing "disability").

bona fide occupational qualification [BFOQ] reasonably necessary to the normal operation of the particular business." 29 U.S.C. 623(f)(1). To prove such a BFOQ, the employer must, the Supreme Court held, show *either* (i) a reasonable basis to believe that "all or substantially all" persons over the age limit would be unable to perform safely *or* (ii) that it is "impossible or highly impractical" to assess the older employees on an individualized basis, *i.e.*, that "some numbers of the discriminated-against class possess a trait precluding safe and efficient job performance that cannot be ascertained by means other than knowledge of the applicant's membership in the class." 472 U.S. at 414, 105 S.Ct. 2743. The Supreme Court squarely rejected any "rational basis" as sufficient to sustain such discrimination and squarely rejected a call for deference by the courts to employers' weighing of safety factors. In the present case, the *Western Air Lines* standard would be hard for UPS to meet.

The "business necessity" defense is "more lenient for the employer" than the BFOQ defense. *Automobile Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 198, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). The business-necessity defense came into employment law when the Supreme Court construed Title VII to authorize a disparate-impact theory of liability. *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), held that facially-neutral qualification standards might have a racially disparate impact illegal under Title VII. Once disparate impact was proven, *Griggs* shifted the burden to the employer to show that the standard was a "business necessity" and was job related. *Id.* at 431, 91 S.Ct. 849. A "significant correlation" between the tests and

important job elements was required. *Id.* at 434, 91 S.Ct. 849. Later, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), added that if the employer meets the burden of proving job relatedness, the complaining party may still show that a less discriminatory test would serve the employer's interest and thus raise an inference of pretext. In 1991, this caselaw was codified in Title VII. 42 U.S.C.2000e–2(k).

An ADEA case from the Eighth Circuit, cited by both sides, is instructive. The issue was whether a physical-fitness test for firefighters, designed to determine their ability to use a self-contained breathing apparatus, had a disparate impact on older workers. Because disparate impact was the theory, the business-necessity defense was implicated. The panel held that, regardless of any disparate impact, the test was justified by business necessity under the ADEA. It held that "a precise or universally perfect fit" was not necessary "particularly when the public health and safety are at stake." In sustaining the omnibus test, the Eighth Circuit found that "a high proportion" of those passing the test could perform firefighting tasks successfully and "a much lower" proportion of those who failed could do so. The test was found to be a legitimate means of distinguishing between "those firefighters who are *probably* capable" from those "who are *probably not* capable." *Smith v. City of Des Moines*, 99 F.3d 1466, 1473 (8th Cir.1996) (emphasis added). Finally, the court stated that the test "directly" measured physical fitness. It did not measure an alleged proxy for fitness.[7]

■ The foregoing history lends meaning to how the business-necessity defense

---

7. The only ADA issue in the case concerned another point, namely the definition of "disability," and was covered at the end of the opinion in a brief and separate section. 99 F.3d at 1474.

was understood when the ADA was adopted in 1990. The ADA did not use BFOQ language. It referenced "business necessity" and "job-relatedness." And, the mischief addressed by the statutory defense was akin to disparate impact, *i.e.*, standards that "tend to screen out" a protected class. In this connection, the Fifth Circuit drew the same comparison when it expressly referred to Title VII and ADEA cases (including the *Smith* case) in *Exxon*. 203 F.3d at 874. So it seems correct that these phrases were intended to mean the same thing in the ADA as they had in Title VII law.

 This is also consistent with the way the defense has been applied under the Rehabilitation Act. *Prewitt v. United States Postal Service*, 662 F.2d 292, 306–07 (5th Cir.1981), largely adopted the *Griggs–Albemarle* analysis under the Rehabilitation Act. *Prewitt* was specifically cited with approval in the legislative history on the ADA provision under scrutiny here. House Rep. No. 101–485 (Part 3), 101st Cong., 2d Sess. at 42 n.32 (1990). The Ninth Circuit's *Bentivegna* decision follows the same general approach without citing *Griggs–Albemarle*. In light of the precedential effect of Rehabilitation Act cases, *see Bragdon v. Abbott*, 524 U.S. 624, 631–32, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the terms "business necessity" and "job related" ought to mean the same thing under the ADA as under Title VII and under the implementing regulations of the Rehabilitation Act. "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.

In such cases, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." *Molzof v. United States*, 502 U.S. 301, 307, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992) (quoting *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952)).

\* \* \* \* \* \*

 The ADA passage in question continues on, however, to state: "and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter." Plaintiffs argue that this clause modifies the traditional business-necessity concept, requiring an individualized assessment of the ability of each applicant to perform the essential job functions. Were this so, however, the proviso would swallow the rule. No standard or test could ever be applied to "screen out" a candidate, the opposite of what the statute expressly contemplates. No authority supports the EEOC's reading. The statute plainly means something else.

It seems clear that the specific proviso in question envisaged reasonable accommodation for performance *of the test itself* and did not speak, at least in the particular proviso, to the issue of accommodations for the ultimate job function. For example, as the Senate Report noted, if an employer required certain outside reading to qualify for a job, then a reasonable accommodation, under the qualification clause, might be letting a dyslexic examinee, otherwise qualified, use a "reader" to earn the requirement. *See* Sen. Report at 38. This is also the purport of the legislative history that the "accommodation" in question is to meet the "criteria that relate to the essential job functions." House Rep. 101–485 (Part 3), 101st Cong.2d Sess., at 31–33, 42 (1990), U.S.Code Cong. & Admin.News 1976, p. 445.[8] To be sure, *other* ADA

---

8. The parties cite other passages (two of which are quoted in full later in the text)

sections address accommodations to perform essential job functions. *E.g.,* § 12112(b)(5). But they apply only once the applicant is "otherwise qualified." If the applicant fails to meet a valid job-qualification requirement, then the applicant is not "otherwise qualified."

\* \* \* \* \* \*

The EEOC also re-advances its "direct threat" counterargument. It goes as follows. After setting forth the business-necessity defense in § 12113(a), the next subsection provides:

> The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

§ 12113(b). Since this is the only ADA passage that refers to "safety," Congress must have intended, the EEOC argues, for subsection (b) to cover any and all safety-based standards. Then, the argument concludes, only proving a "direct threat" is sufficient to sustain a safety-based qualifications standard. And, the EEOC adds, individualized determinations of the threat must be made in every case. Finally, the burden of proof is on the defendant, the EEOC argues. The general rule in subsection (a) only covers "general" qualification, like the ability to type fifty words per minute, under the EEOC's construction, whereas subsection (b) covers all safety issues. Although the Ninth Circuit has not yet spoken, the Fifth Circuit in *Exxon* rejected this argument and the Supreme Court "questioned" it in *Kirkingburg* in its Footnote 15. 527 U.S. at 569, 119 S.Ct. 2162.

In part, the EEOC's argument has merit. Nebulous safety concerns cannot justify discrimination against the disabled. But beyond this point, the Court must part company with the EEOC. Here is why: The "direct threat" clause derives from *School Board of Nassau County v. Arline,* 480 U.S. 273, 287–88, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). That decision under the Rehabilitation Act held that a school teacher with tuberculosis was a "handicapped person" under the Act and, in determining whether she was "otherwise qualified," the district court was to make, on remand, an individualized determination of whether there were "significant health and safety risks" of contagion. The factors to be considered were: (a) the nature of the risk (how the disease is transmitted); (b) the duration of the risk, (c) the severity of the risk, and (d) the probabilities of transmission. The decision did not involve a health or safety standard but involved a discrete teacher and an isolated termination based on her disease. *Accord Nunes v. Wal–Mart Stores, Inc.,* 164 F.3d 1243, 1248 (9th Cir.1999). In the ADA, Congress intended to approve and to incorporate *Arline* and to expand it to other disabilities. *See, e.g.,* House Rep. No. 101–485 (Part 3), 101st Cong., 2d Sess., at 45–46 (1990). A "direct threat" means a "significant risk," according to the legislative history. *Id.* at 46; Conf. (House) Rep. No. 101–558, at 58 (1990).

Without question, this history shows that Congress intended to bar vague and indirect risks as excuses to discriminate against the disabled. But nothing in *Arline* (or the legislative history referenced) disapproved omnibus safety-based rules

---

further supporting the construction taken above. There is one passage in the legislative reports, however, that seems to indicate that even if a qualification criterion is legitimate, the employer must also check to see whether a reasonable accommodation would enable the disabled person to perform the essential function of the job. Sen. Rep. No. 101–116, *supra,* at 27. That passage was early on in the process and stands in contrast to the many others referenced and, frankly, to the basic logic of a "qualification standard."

justified by "significant risks." In this regard, a "standard" (for audible hearing) was sustained as a legitimate qualification for nursing under the Rehabilitation Act in *Southeastern Community College v. Davis,* 442 U.S. 397, 413, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), indicating that blanket qualification "standards" were acceptable under the Rehabilitation Act. To read "direct threat" as synonymous with "individualized assessment" as to each essential job function, 29 C.F.R. 1630.2(r), would eviscerate any safety-based job-qualification standard at all. Graphically, the EEOC even stated at oral argument that a totally blind applicant for a driver job would, under its interpretation, be entitled (under any and all circumstances) to an individualized inquiry concerning whether he or she could be a safe driver. This Jacobin view seems extreme, unwise, counter to legislative intent and even at odds with what the EEOC has contended in other cases. *Rizzo v. Children's World Learning Centers, Inc.,* 213 F.3d 209, 212 n. 4 (5th Cir.2000). The Court must respectfully disagree with the EEOC's current interpretation.[9]

\* \* \* \* \* \*

At the same time, the Court respectfully disagrees with UPS's construction. Significantly, what UPS must ultimately acknowledge is that the classic formulation of the business-necessity defense includes, not excludes, the question of whether less discriminatory means are available to serve the employer's goal. Thus, while the defense requires "significant correlation" to show "job-relatedness," the business-necessity defense also allows the complaining party to show there are practical and less discriminatory alternatives to job-qualify applicants.

To this, UPS replies that a tepid version of the business-necessity defense was adopted by the ADA in 1990. This argument is based on the passage of the later Civil Rights Act of 1991 codifying the business-necessity defense as it existed before *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). The later codification preserved, among many factors, the sub-issue of "alternative employment practices." 42 U.S.C.2000e–2(k). It is true, as UPS argues, that the earlier ADA did not call out this sub-issue by name but that does not mean it was deleted from the ADA defense. The idea that later and different legislation may be used to show an intent to omit provisions from earlier enactments is unprecedented as far as this Court can tell. But the main point is this: *Wards Cove* in no way eliminated the issue of less discriminatory alternatives; to the contrary, the decision approved their continued consideration. 490 U.S. at 660, 109 S.Ct. 2115. There was simply no need in the 1990 ADA to call out all details of the business-necessity doctrine, the terms al-

---

9. *See Buck v. United States Department of Transportation,* 56 F.3d 1406, 1408 (D.C.Cir. 1995):

Where the agency has established a certain safety standard, however, and there is no way in which an individual with a certain handicap can meet that standard, the law does not require the pointless exercise of allowing him to try. In this case the agency has reasonably determined—at least until it is presented with evidence to the contrary—that in order to operate a vehicle safely a driver must be able to hear with a certain acuity. Once an individual has ad-

mitted that he does not meet such a necessary—as opposed to a merely convenient—standard, the Rehabilitation Act does not forbid the application to him of a general rule.

Some district courts have adopted the EEOC's formulation and held that per se qualification standards are illegal and that direct-threat assessments must be made on an individualized basis. *E.g., Bombrys v. City of Toledo,* 849 F.Supp. 1210, 1216, 1220 (N.D.Ohio 1993); *Sarsycki v. United Parcel Service,* 862 F.Supp. 336, 341 (W.D.Okla. 1994). No court of appeals has done so.

ready having an established meaning (including less discriminatory alternatives) even under *Wards Cove*. The 1991 Act, in contrast, was trying to overturn certain aspects of *Wards Cove* and had to be more specific and explicit, calling out issues and sub-issues by name. UPS's attempt to construct a toothless version of the business-necessity defense under the ADA must be rejected.[10]

The ADA does not, as a matter of statutory language, define "business necessity" or "job related," although it does define other terms like "reasonable accommodation," "direct threat" and "undue hardship." This also tends to indicate that Congress meant to carry forward the already established meanings of the terms.[11] The legislative history confirms this intent. The House Report on what became the ADA stated:

> If a person with a disability applies for a job and meets all selection criteria except one that he or she cannot meet because of a disability, the criterion must concern an essential, and not marginal, aspect of the job. *The criterion must be carefully tailored to measure the actual ability of a person to perform an essential function of the job.* If the criterion meets this test, it is not discriminatory on its face and is not prohib-

ited by the ADA. If the legitimate *criterion can be satisfied by the applicant with a reasonable accommodation,* then the reasonable accommodation must be provided under Section 102(b)(5).

\* \* \* \* \* \*

This section prohibits the use of qualification standards, employment tests or other selection criteria that screen out or tend to screen out persons with disabilities, unless the criteria are shown to be job related and consistent with business necessity.

If an employer uses a facially neutral qualification standard, employment test or other selection criterion that has a discriminatory effect on persons with disabilities, this practice would be discriminatory unless the employer can demonstrate that it is job related and required by business necessity.

The requirement that job selection procedures be job-related and consistent with business necessity *underscores the need to examine all selection criteria to assure that they not only provide an accurate measure of an applicant's actual ability to perform the job,* but that even if they do provide such a measure, a disabled applicant is offered a reasonable accommodation *to meet the criteria*

---

**10.** The Senate report stated that the business-necessity defense was to be construed as to "burden of proof" as the agency regulations had defined it prior to *Wards Cove*. Sen. Rep. No. 116, 101st Cong., 1st Sess., at 37–38 (1989). Judge Reinhardt's panel opinion in *Yin v. California*, 95 F.3d 864 (9th Cir.1996), is not to the contrary. There, the Ninth Circuit held that "business necessity" § 12112(d)(4)(A) justified compelling a state worker, racked with a record of absenteeism, to submit to an independent medical examination. UPS is correct that Judge Reinhardt did not "require" the employer to prove the IME would be the least intrusive test possible. That was because the contention was not presented. A close reading of the footnotes show

that intrusive exams, such as a vaginal inspection, were already off the table. *Id.* at 868 nn.7 and 8.

**11.** The defense is mirrored in the definition of "discrimination." Use of tests not shown to be job related and consistent with business necessity is discriminatory when they tend to screen out the disabled. 42 U.S.C. 12112(b)(6). "Not making reasonable accommodation" is likewise unlawful unless undue hardship is shown. 42 U.S.C. 12112(b)(5)(A). In the absence of guidance on the face of the legislation, it seems reasonable to incorporate fully the way the terms were understood when the legislation was adopted.

*that relate to the essential functions* of the job at issue. It is critical that paternalistic concerns for the disabled person's own safety not be used to disqualify an otherwise qualified applicant.

House Rep. No. 101–485 (Part 3), 101st Cong., 2d Sess., at 32–33, 42 (1990) (emphasis added). The pointed references to "carefully tailored" tests and calling for "accurate measures" of job performance are telling. These excerpts and others harken to the traditional business-necessity test. *Accord* House Rep. No. 101–485 (Part 2), 101st Cong., 2d Sess., at 71–72 (1990); Sen. Rep. No. 101–116, 101st Cong., 1st Sess., at 37–38 (1989). The last-cited reference incorporated four federal regulations under Section 504 of the Rehabilitation Act and stated that the burden of proof under the ADA should be construed in the same manner (and should be construed pre-*Wards Cove*). Those regulations were, in essence, the same as the holding of the present order.

\* \* \* \* \* \*

■ In light of all of the foregoing and in the absence of any controlling precedent, this order holds that the ADA business-necessity defense was intended to follow the business-necessity defense developed under Title VII and the Rehabilitation Act, including consideration of less discriminatory alternatives. UPS is correct that it need not show its standard is the most narrowly-tailored possible. A less exact fit is permissible. Some elbow room exists. The legislative history used the phrase "carefully tailored," not "precisely tailored." But it is not enough for an employer merely to prove a "logical" or "rational" nexus between a test and a job skill. That would validate too many blunt instruments. A "significant correlation" must be shown through "professionally acceptable methods." *Albemarle*, 422 U.S. at 431, 95 S.Ct. 2362; *Mexican-*

*American Educators v. California*, 231 F.3d 572, 584 (9th Cir.2000).

■ The initial validation issue in step one boils down to three questions: (i) identifying the specific trait or characteristic to be measured (here vision); (ii) identifying the important elements of work behavior, *i.e.*, the essential job function supposedly measured (here the ability to drive a commercial truck safely on a full-time basis); and (iii) determining if the test is "significantly correlated" with performance of the essential job function. Where public safety is concerned, informed judgment must sometimes substitute for statistics in assessing the validity of a standard:

> When an employer establishes that a job qualification has been formulated to respond to documented concerns for public safety, it will not be overly burdensome to persuade a trier of fact that the qualification is "reasonably necessary" to safe operation of the business. The uncertainty implicit in the concept of managing safety risks makes it "reasonably necessary" to err on the side of caution in a close case. The employer cannot be expected to establish the risk of an airline accident to a certainty, for certainty would require running the risk until a tragic accident would prove that the judgment was sound.

*Western Air Lines, Inc.*, 472 U.S. at 419–20, 105 S.Ct. 2743 (quoting *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 238 (5th Cir.1976)); *see also Kirkingburg*, 527 U.S. at 573, 119 S.Ct. 2162; *Smith*, 99 F.3d at 1473. That said, indirect safety risks are insufficient. Taking the *Arline* factors into account, including the severity of the harm, the safety risk must be found significant and direct.

■ Even if a test is validated in step one, the complaining party may try to demonstrate in step two that less discrimi-

natory procedures would comparably serve the employer's interest. If shown, then an allowable (but not compulsory) inference of pretext, i.e., lack of business necessity, arises.[12] The ultimate question on this branch of the test is whether there is business necessity, taking into account all of the evidence. But if the employer establishes a "significant correlation" between the test and an essential job function and no less discriminatory alternative with comparable business utility is proven, then the qualification standard is valid. In this way, only "carefully tailored" tests will endure. Reasonable accommodation must be allowed for taking the test itself but anyone who fails a valid standard will simply not be qualified. Regrettably, a valid test might well "screen out" some who would be able to perform safely, as the face of the statute contemplates, but they would be the exception and not the rule. This seems consistent with the Ninth Circuit's caselaw under the Rehabilitation Act. *Bentivegna*, 694 F.2d at 621–23.[13]

In the absence of a valid safety-based qualification standard, the regime defaults to a case-by-case determination of whether the disabled applicant can perform the essential job functions. In this inquiry, the burden of proof is on the applicant. If an essential job function requires safety, as in the ability to drive safely full time, then the applicant has the burden of proving he or she can perform that function, including the safety part. *E.g., EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir.1997); *Altman v. New York City Health and Hospitals Corp.*, 100 F.3d 1054, 1060 (2d Cir. 1996); *Rizzo v. Children's World Learning*

*Centers, Inc.*, 213 F.3d 209, 213 n. 4 (5th Cir.2000).

\* \* \* \* \* \*

▮ With these considerations in mind, this order now turns to the vision protocol at issue. As stated, the full-time ability to drive a commercial truck safely is an essential job function. It is an important element of the work behavior in question. Safe driving is the trait or characteristic the protocol is designed to measure. Two issues loom large. The first is whether UPS has shown a "significant correlation" between the protocol and driver safety. The second concerns less discriminatory alternatives. As to the first, it is disappointing that, in the wake of the disclosures during the mid-trial deposition, the architect of the UPS vision protocol, Dr. Witkin of Emory University, was dropped as a trial witness by UPS. In validating the protocol (or not), his fresh testimony would have been welcomed. Nonetheless, his various depositions were excerpted by the parties and have been considered. So has been the record of his correspondence with UPS.

It is worth stating the obvious. Driving requires seeing. Anyone substantially limited in the major life activity of seeing will, to some extent at least, be limited in driving ability. With respect to the *Arline* factors, the findings above lay out the "nature of the risk," i.e., how vision and traffic safety interrelate. The Court finds that clear central acuity in one eye and some peripheral vision in the other are important in driving UPS-type trucks. The "duration" of the risk is permanent and ever present. The jobs in question are full-

---

12. *Wilmington Firefighters Local 1590 v. City of Wilmington*, 632 F.Supp. 1177, 1187 (D.Del.1986).

13. The holding of this order is consistent with *Kapche v. City of San Antonio*, 176 F.3d 840,

847 (5th Cir.1999) (if per se exclusion of insulin-dependent police candidates no longer justifiable, then individualized assessment required on remand); *Stillwell v. Board of Police Commissioners*, 872 F.Supp. 682, 688 (W.D.Mo.1995).

time, day after day. The "severity" of the risk is extreme in cases of traffic fatalities. The "probability" of an accident is remote for both monocular and binocular drivers. Combined, these factors would warrant findings of both "significant risk" and "direct threat" in circumstances where a standard is carefully drawn. For the reasons stated in the findings, this order holds that UPS could have drawn a "carefully-tailored" vision protocol.

But it did not actually do so in this case. Dr. Witkin spent only five hours over two weeks crafting the form. The form never went through vetting. It never went through field testing. Use in the field revealed implementation errors, ambiguities and confusion. UPS refused to modify it except to eliminate any convenient way for doctors to indicate that examinees were qualified. Instead of defending its vision protocol at trial, UPS instead brought in four experts to testify to more abstract issues of traffic safety and monocularity. None of them vouched for the actual protocol at issue. While the broad public policy debate over monocularity has relevance, the focus eventually must return to the genuine article on trial. That article, the Court must find, was not "carefully tailored." Even as "intended," the protocol swept too broadly and was not significantly correlated with the ability to drive safely. A clearly written protocol that required excellent acuity in one eye and at least some peripheral vision in the other would have, in the Court's view, satisfied step one. The UPS protocol in question swept beyond this, barring, for example, those with peripheral vision in both eyes but no central vision in one eye.[14]

As to step two, the Court further finds, contrary to UPS's view, that less discriminatory alternatives exist that would serve UPS's needs without diluting safety. Those who lose an eye, the record shows, often overcome the disability through compensatory techniques. These techniques are described in the findings above, such as more conservative driving practices that take into account reduced reaction time and more frequent scanning from side to side. In recognition of this, almost all states allow monocular drivers to operate cars, vans and lighter-weight trucks. UPS's own limited experience with monocular drivers such as Ms. Harbison and the DOT vision-waiver enrollees likewise so indicates. Dr. Witkin testified that some safe drivers will fail the protocol (and some unsafe drivers will pass it). The Court finds that a substantial number of monocular applicants could be just as safe as the run of binocular drivers regularly hired by UPS.

UPS relies on the obvious truism that it is impossible to predict which monocular drivers will and which will not have accidents. The same could be said of binocular individuals. The truism leads nowhere. What matters is whether UPS could identify specific risk factors and then use those factors to sort disabled applicants, for example, into risk categories. A valid protocol might legitimately measure impaired vision as a risk factor. A failing grade should be a red flag requiring a more

---

**14.** For validation, UPS claims it was entitled to base its vision policy on the DOT standards for heavier trucks. This is not what Dr. Witkin did or was asked to do. His assignment was to determine how far the DOT standards could be relaxed in light of their non-applicability to lighter-weight trucks. The DOT standards themselves stated that they only applied to the heavier class of vehicles and it would be up to others to decide on what restrictions would be warranted in regard to lighter vehicles. At most, moreover, the DOT standards could have been "relevant evidence" but not "conclusive evidence" in UPS's development of vision restrictions for lighter-weight vehicles. *See Western Air Lines*, 472 U.S. at 418, 105 S.Ct. 2743; *Williams v. Hughes Helicopters, Inc.*, 806 F.2d 1387, 1390 (9th Cir.1986).

detailed inquiry. If unanswered by other evidence, such a failing grade would warrant rejection of a candidate on safety grounds. When other evidence is available, however, it can and should be taken into account, as follows.

*First,* UPS can and should consider whether the applicant has had the benefit of rehabilitative or specialized driver training to compensate for the impairment. *Second,* UPS can and should consider whether the applicant has a sustained driving record (with the impairment) indicating he or she has successfully overcome the impairment. In this connection, it would not be sufficient for an applicant to show an accident was not his or her fault. UPS could insist on the ability to avoid avoidable accidents regardless of fault. UPS could also insist on reliable proof of one's driving history and would not be at the mercy of the applicant's version of accidents. *Third,* UPS can and should consider whether the applicant has previously successfully driven commercial delivery vehicles (such as Federal Express, newspaper delivery trucks, or postal vehicles) with the impairment. *Fourth,* UPS could require the monocular applicant to take a supplemental driving test specifically designed to simulate the scenarios of concern, such as the darting pedestrian or cyclist. Any and all of these approaches would provide additional evidence on the critical issue of whether the applicant has adjusted to and compensated for the disability sufficiently to be as safe a driver as those typically hired by UPS.

At present, UPS spurns all such follow-up and rejects any and all monocular applicants—even those with long and stellar driving records. UPS will not even let

them provisionally advance to its advanced courses and thirty-day driver training. Even a carefully-tailored vision protocol would measure only vision and thus measure only half of the equation. It overlooks the other half, namely, how well the applicant has overcome the vision impairment and become a safe driver anyway. Significantly, Dr. Witkin never told UPS that it would be impractical to consider the balance of the equation. Nor has UPS ever tried such alternatives and failed.[15] When the DOT standard receded for lighter-weight vehicles, UPS simply substituted its pass-fail standard without consideration of whether such additional information could be taken into account. The Court finds that such further evaluation would be practical without compromising safety. In sum, the UPS vision protocol cannot be used to disqualify disabled monocular applicants on a per se basis. A revised version of it could be used as a starting point for an individualized assessment.

The Court recognizes that the end result reached herein is largely consistent with EEOC's end result but nonetheless disagrees, for the reasons stated, with the EEOC's statutory analysis universally requiring individualized reviews. Some carefully tailored standards will pass muster and there will be no less restrictive but practical alternatives. In any such case, an omnibus application of a general rule would be lawful. The difference is that, on the present record, the Court finds that less restrictive measures would equally serve the employer's interest.

Given the invalidity of the protocol, the "qualifications" issue reduces to the normal default procedure under the ADA,

---

**15.** As well, more could be done in UPS's training. UPS witnesses testified that its vaunted training program will work "for anyone" and that UPS can teach anyone to be a safer driver (TX 11 at 3). During the Space

and Visibility training and the thirty-day on-the-road training, UPS could offer course segments specially designed to strengthen monocular driving skills.

namely: has the applicant carried the burden to show that he or she is qualified to perform the essential job functions? For the reasons already stated, this order holds that Mr. Hogya has shown that he is qualified sufficiently to proceed to UPS's advanced level of training and evaluation, whereas Mr. Francis and Mr. Ligas have not.

### The Alleged Obstacles of Seniority and the DOT Card

■ UPS insists that it would do no good to bring monocular drivers into the ranks of the full-time package-car drivers because they would be unable to perform the supposed essential job function of standing ready to fill in for absent bid drivers. Recall that, for the first few years, the typical full-time driver remains an "unassigned" floater, substituting for the more senior "bid" drivers as they absent themselves from time to time. Most routes are driven with trucks weighing more than 10,001 pounds. To drive them, a DOT card is needed. Monocular drivers cannot qualify for a DOT card. Consequently, most of the time, they would be unable to go out as assigned. They could only handle the routes using trucks under 10,001 pounds. Only eight percent of the overall UPS fleet is under that limit. So, most of the time the impaired operator would have nothing to do, or so UPS argues.

■ If so, the Court wonders why UPS adopted its vision protocol in the first place. UPS must have had a plan for how it would meaningfully use those who passed (none of whom could qualify for a DOT card by definition). Otherwise, the protocol was a sham and dangled false hope. If UPS is now correct, it was pointless for UPS to have sent Mr. Hogya, not to mention Ms. Harbison, to eye doctors for repeated protocol examinations. This alone convinces the Court that it is not an essential job function to be able to fill in

for any and all drivers and/or that UPS will find a way to work the disabled into its driver force. The company's own ADA manuals call for "making a change in the usual way of doing things so that a qualified person with a disability can participate" (TX 1056 at 231).

The evidence further shows that UPS has complete flexibility in designing routes and assigning trucks. UPS could redesign routes that could be driven in lighter-weight trucks. UPS can relocate the vehicles from district to district. Even though they constitute only eight percent of the fleet, there are thousands of the lighter-weight vehicles around the country. This would be somewhat inefficient but not sufficiently so in most cases as to be an undue hardship on UPS. *See* 42 U.S.C. 12111(10). UPS also has the right to work with the union to find solutions for the disabled. UPS did all this in Ms. Harbison's case. UPS is correct that granting Ms. Harbison an accommodation did not "obligate" it to grant any others, but the Harbison story is highly relevant to show feasibility of accommodation. *Wong v. University of California,* 192 F.3d 807, 820 (9th Cir.1999). It may well be that in individualized cases, UPS will be able to demonstrate that there is and will be no work for a monocular driver. For now, before UPS even tries and fails, the Court is unwilling to validate an across-the-board, nationwide, and permanent excuse for not even trying.

■ The ADA requires affirmative efforts by UPS to engage in an interactive process to find reasonable accommodations:

> The interactive process is the key mechanism for facilitating the integration of disabled employees into the workplace. Employers who reject this core process must face liability when a reasonable accommodation would have been possible. Without the interactive process,

many employees will be unable to identify effective reasonable accommodations. Without the possibility of liability for failure to engage in the interactive process, employers would have less incentive to engage in a cooperative dialogue and to explore fully the existence and feasibility of reasonable accommodations.

\* \* \* \* \* \*

We hold that employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible.

*Barnett v. United States Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir.2000). Until UPS has carried out its affirmative obligation to try, it is premature to determine whether UPS would encounter undue hardships or insurmountable barriers. Thus, if Mr. Hogya eventually passes successfully the required course work and thirty-day training, UPS must attempt to find a reasonable accommodation for him. The Court is confident that a *modus vivendi* will emerge, just as it did for Ms. Harbison. If UPS allegedly tries and fails, then the issue of undue hardship will be decided on an individual basis. So too with all other disabled applicants who have failed the protocol and are shown to be qualified to proceed to the advanced training.

### The Issue of Pre–July 1995
### Liability for Damages

■ All agree herein that the DOT regulations trump the ADA, *i.e.*, that the ADA could not override the federal safety vision minimums. This was a direct holding of *Kirkingburg*. 527 U.S. at 568–77, 119 S.Ct. 2162. Until July 1995, those regulations literally applied to all UPS vehicles regardless of weight. When the regulations were lifted as to lighter-weight trucks, all further agree that the ADA

became effective as to drivers for those trucks.

Plaintiffs argue that DOT meant to lift the regulations as to lighter-weight trucks back in 1988. 53 Fed.Reg. 18044 (May 19, 1988). They argue, therefore, that damages can be sought for the period earlier than July 1995. Although the Court agrees that DOT stated in 1988 that it *intended* to exempt vehicles under 10,001 pounds, the fact is that in the actual 1988 event, *i.e.*, the actual amendment, DOT failed to do so, neglecting to change the phrase "motor vehicle" to "commercial motor vehicle" in the physical qualifications regulations. *See* 49 C.F.R. 391.41 (1993 ed.). DOT then had to come out with "technical corrections" in July 1995 to carry out its original intent. 60 Fed.Reg. 38739 (1995). Why it took so long has never been explained.

True, from 1988 on, DOT did not enforce the regulations as written. And, UPS managers knew it. But the fact remains that the law on the books, as written, applied to trucks of all sizes and for all companies. Like any citizen, all companies stood potentially liable had they violated the law as written. It would be unfair to hold an employer to any standard other than the law as actually written.

This is not a case like *In re Century Cleaning Services, Inc.*, 195 F.3d 1053, 1057–59 (9th Cir.1999), in which an *ambiguity* within the statute itself (or here the regulation) could be construed. Here, the conflict was between the *preamble* in 1988 and the resulting 1988 regulation. Within the 1988 regulation, there was no ambiguity. *See McElroy Electronics v. FCC*, 990 F.2d 1351, 1366 (D.C.Cir.1993) ("regulations cannot be construed to mean what an agency intended but did not adequately express"); *Wyoming Outdoor Council v. United States Forest Service*, 165 F.3d 43, 53 (D.C.Cir.1999) (preamble of regulation

not controlling over language in regulation itself). True, *Sarsycki v. United Parcel Service,* 862 F.Supp. 336, 340–41 (W.D.Okla.1994), came out the other way. The undersigned respectfully disagrees with its holding. *Sarsycki* cited no authority for the proposition that a preamble can override the plain and clear wording of the regulation itself. The plain language of the regulation being clear, the preamble cannot override it.

Any liability for damages, therefore, will run only from the date of the July 1995 amendment. This holding also eliminates the need to determine whether UPS's use of the DOT standard from the effective date of the ADA until its June 1995 vision protocol violated the ADA.

### The Mechanics Issue

 For the following reasons, this order finally holds that the relief sought on behalf of UPS mechanic Ray Brown, and others similarly situated, falls outside the scope of the EEOC charges defining the boundaries of this lawsuit. To bring a claim under the ADA, the EEOC must comply with the procedural requirements set forth in Section 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.2000e–5. *See* 42 U.S.C. 12117(a). These procedures require the EEOC to "notify the alleged wrongdoer of the charge, conduct an investigation and *determine whether reasonable cause exists* to believe that the charge is true." *EEOC v. Pierce Packing Co.,* 669 F.2d 605, 607 (9th Cir.1982) (emphasis added), (citing 42 U.S.C.2000e–5(b)). The EEOC may not file a lawsuit with respect to allegations of discrimination that were not included in the reasonable-cause determination. *See* Schlei and Grossman, "Employment Discrimination Law" 1481 (3rd ed. *ADA Labor and Employment Law Section,* 1996) (EEOC may not bring a Title VII suit unless it first issues a reasonable-cause determination that covers the issues to be raised in the suit).

In *EEOC v. Hearst Corp., Seattle Post–Intelligencer Div.,* 553 F.2d 579, 580 (9th Cir.1976), the court stated (emphasis added):

> In other words, the original charge is sufficient to support EEOC administrative action, as well as an EEOC civil suit, for any discrimination stated in the charge itself or discovered in the course of a reasonable investigation of that charge, *provided such additional discrimination was included in the EEOC "reasonable cause" determination and was followed by compliance with the conciliation procedures of the Act.*

Indeed, the Ninth Circuit has expressly held that the determination letter and conciliation are "jurisdictional conditions precedent to suit by the EEOC." *EEOC v. Bruno's Restaurant,* 13 F.3d 285, 288 (9th Cir.1993) (quoting *Pierce Packing Co.,* 669 F.2d at 608). Accordingly, the Court lacks jurisdiction over any claim of discrimination which has not been made the subject of a reasonable-cause determination and which has not been the subject of conciliation following the issuance of the cause determination.

Although Ray Brown filed an EEOC complaint, he did so after this civil action was commenced. The EEOC has never issued a determination letter as to him. The EEOC complaint herein does not mention mechanics, focusing as it does on drivers. The EEOC cause determinations that laid the foundation for this lawsuit related to Ms. Harbison and Mr. Francis, both driver applicants. The Francis cause determination, representative of the other two, stated (TX 1073):

> Based upon a review of the record of evidence, I find that there is reasonable cause to believe that respondent discriminated against Charging Party by

denying him the Air Driver position because of his disability or perceived disability. Furthermore, I find that there is reasonable cause to believe that Respondent has discriminated against disabled employees as a class on the basis of their disability or their perceived disability, monocular vision.

Even granting substantial liberality in construing the cause determination, it would be an unfair stretch to reach Mr. Brown. The determinations all involved driver applicants. Mechanics are not drivers. They only drive incidentally to their repair and maintenance functions. Mr. Brown, in fact, is allowed to test drive the lighter-weight trucks (since he passed the protocol). The point of contention is more attenuated, namely whether he should also be allowed to test drive the heavier trucks (incidental to his mechanics work) without a DOT card (which he cannot obtain) on the theory that DOT has no jurisdiction over what the EEOC alleges is purely "intrastate" driving.

A reasonable employer would not have been put on notice of the need to conciliate as to this issue by the quoted language in the determination. It was thus unfair to unfurl this new theater of the EEOC's campaign against UPS in this lawsuit after it was already underway. Instead, the EEOC should issue a determination letter as to Mr. Brown and others like him and proceed in an orderly fashion in a new lawsuit if conciliation fails. The Court will not rule out the possibility that some UPS mechanics with some claim much more like those determined above could proceed herein but, barring that narrow possibility, all mechanics claims are outside the scope of this lawsuit and will be dismissed. The claim on behalf of Ray Brown is dismissed without prejudice.

### Punitive Damages

The issue of punitive damages will be deferred until all claimants' cases, including those waiting in the wings, are determined.

### CONCLUSION

For the foregoing reasons,

1. With respect to all monocular applicants for any driver position in its domestic U.S. operations, defendant UPS is **ENJOINED** from further using its vision protocol unless (i) the form and instructions are modified as indicated hereinafter and (ii) those who fail the protocol, even as modified, are provided a fair and individualized opportunity to demonstrate that they are as qualified to drive safely as those whom UPS ordinarily hires. The required modifications, if a vision protocol is used, are to determine the central-vision acuity in each eye (with $20/40$ (Snellen) or better in one eye as a passing grade) and to determine if there is at least gross peripheral vision in the affected eye (with no more being required for that eye). (Color blindness and stereopsis may be treated as before.) Clear instructions must accompany the form.

2. UPS must allow Shawn Hogya to advance to UPS's driver training and thirty-day trials. If he passes, then UPS is **ORDERED** to enter into an interactive process with him (and the union if need be) to find practical ways for him to find work as a full-time driver of vehicles weighing less than 10,001 pounds. A damages trial date and pre-trial schedule shall be set once it is determined whether he successfully completes the training and testing to be a full-time driver.

3. The claims of (or on behalf of) James Francis, Stephen Ligas and Ray Brown are **DISMISSED** without prejudice.

4. The claims of all other mechanics are **DISMISSED** unless, within thirty

days, the EEOC identifies specific individuals and shows cause why their cases fit within the narrow exception set forth above.

5. The Court finds that there is no just reason for delay and expressly directs, pursuant to FRCP 54(b) that **JUDGMENT** be entered in favor of plaintiff/intervenors as to Items 1 and 2 above and in favor of defendant as to Items 3 and 4 above. Within five court days, all parties shall submit an agreed-upon form of judgment that carries out the foregoing.

6. The Court retains jurisdiction to supervise the foregoing relief.

7. All **INJUNCTIVE RELIEF** in favor of plaintiff/intervenors shall be stayed until January 31, 2001, at 5:00 p.m., to allow UPS to seek any appeal and to apply for an appellate stay. On January 25, 2001, at 11:00 a.m., counsel shall attend a case management conference to determine a procedure for resolving the remaining claims. Please submit a short joint statement five days in advance.

**IT IS SO ORDERED.**